## WESTINGHOUSE ELECTRIC & MANUFACTURING CO. v. NATIONAL LABOR RELATIONS BOARD.

### No. 289.

Circuit Court of Appeals, Second Circuit.

June 10, 1940.

SWAN, Circuit Judge, dissenting.

Harold Smith, C. A. Reinwald, Donald C. Swatland, and Roswell L. Gilpatric,

all of New York City (Cravath, De Gersdorff, Swaine & Wood, of New York City, of counsel), for petitioner.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, and Ruth Weyand, Mortimer B. Wolf, and Morris L. Forer, all of Washington, D. C., for National Labor Relations Board.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This case comes up upon a petition by the employer to review a "cease and desist" order of the Labor Board; and upon a petition of the Board for an order of enforcement. The conduct which the Board found unlawful principally concerned the change from a "Plan" of collective bargaining, instituted before the National Labor Relations Act was passed, to the formation in its place at the respondent's Bloomfield plant, of an unaffiliated union, called the "Independent". The company's position is that the "Independent" was the result of the spontaneous and free agreement of its employees; the Board's, that the company's influence continued apparently to pervade the new organization so as to dominate it within the meaning of § 8 (2) of the Act, 29 U.S.C.A. § 158 (2). An outline of the facts found, all of which have "substantial" support in the evidence, is as follows: In 1933 the company organized the "Plan", so called, for dealing with matters which might arise between its employees and itself. It is not necessary to go into the details more than to say that the governing committees of this organization were made up equally of elected representatives of the employees, and of "management employees" appointed by the company. Though the company does not appear to have had control, at least it had such a joint share in the "Plan's" management and direction as the statute now forbids. In March of 1937 some of the employees began to organize a local of the C.I.O., and later secured a charter; on April 12, 1937, the Supreme Court declared the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., constitutional.

The "Joint Conference Committee" of the "Plan" was its authoritative governing body, and it held a meeting on April 21, presided over by the superintendent of one of the company's "divisions". Ap-

parently the company was still in doubt as to how far the "Plan" was unlawful; but the committee appointed a sub-committee to revise it, four of the ten members being "supervisory employees" Conselyea, then chairman of the newly formed C.I.O. local, refused to join this sub-committee; but Newton, who later became president of the local, did join, and appears to have taken part in its deliberations. A majority of this sub-committee wished to exclude all management control, though not to affiliate with any national union; but, although it met about five times, it never made any proposals, and appears merely to have faded out. By May 12th the company had decided that the "Plan" was unlawful, and the plant manager, Madden, called another meeting of the "Joint Conference Committee", and declared that the company would no longer support the "Plan"; that it would be discontinued; that he was not interested in what plan the employees adopted; that it was their business; and that he would not, and could not lawfully, even answer any questions about it. He and the "personnel manager", who was also present, then left the rest—all elected members of the old "Joint Conference Committee"—and they began to examine an informal poll of employees, taken in the plant by elected representatives, to find out what was the general feeling towards affiliation with a national union. They concluded that eighty per cent. of the employees were against it, but apparently did nothing further except to ask Madden to keep on dealing with the old representatives until some substitute might be organized for the "Plan". Madden answered that he would be glad at any time to meet any group of employees; but from then on the "Plan" ceased to function, and never revived.

On the 20th one, Hennelly, a former elected member of the "Joint Conference Committee", called together twenty employees, all but two or three of them former members of the committee, and they deputed two of their number, Donnelly and Shepard, to draft a constitution for a new unaffiliated union. Donnelly had been chairman and vice-chairman of the "Joint Conference Committee", and Shepard had been secretary of all committees under the old "Plan". They finished the draft by June 4, using as its basis some of the notes taken of proposals put forward at the meeting of May 12th, and also a mimeograph of an amended constitution which was considered at the meeting on April 21st. There is no evidence, and the Board does not find, that Donnelly and Shepard conferred with any of the company's officials in drawing up this constitution. Cards were circulated among all the employees, by which a large majority of them agreed to "abide by and uphold" the constitution, and to subscribe for its support. On June 21st the "Independent" held an election of officers and representatives, and on the 23rd the company began to deal with them as representatives of its members, but of the members alone. On August 10, 1937, the "Independent" petitioned the Board for recognition as exclusive bargaining agent for the employees; it also attempted to secure similar recognition from the company. In both cases it was unsuccessful, and in December it held an election under the auspices of disinterested outside persons, which resulted in an overwhelming majority in its favor of those voting. The Board, which had refused to hold any election, filed its complaint on March 8, 1938.

So far, it does not appear that the company had tried in any way to influence the employees in the formation of the "Independent", or against the local. To the "Joint Conference Committee" Madden had explicitly dissociated the company from the new organization, and told the men to do as they pleased; nevertheless, the "Plan" had never been openly "disestablished", and to it the "Independent" succeeded without any line of fracture, at least on the surface. To supplement this lack of positive evidence of "domination" by the company, the Board made three specific findings of discrimination against the C.I.O. local. The first of these was a talk between Thoms, a company superintendent, and Conselyea, president of the new local. Conselyea had got leave from Madden to hold a meeting of the C.I.O. local in May, 1937, and had held it. Thoms summoned him later on the same day to his office, and asked him whether his job was more important to him than the union. The company seeks to minimize the significance of this, but the Board was justified in holding that Conselyea would naturally take the remark as indicating that his union activities were putting his job in jeopardy. The second discrimination was the company's refusal to let the local use the Recreation Room for an address by a C.I.O.

660

organizer because he was not an employee. The company would of course have been justified in refusing the use of its quarters, Recreation Room or not, for the purpose of any electioneering whatever; but it did not do this. The "Independent" was allowed to use that and other rooms for that purpose, and equal treatment, in the case of an affiliated union, presupposed that officers and representatives from affiliates or from the national offices should be accorded the rights of officers of an unaffiliated union. The Board was right in treating this too as discrimination. The third instance was the company's refusal to allow the C.I.O. local to use its bulletin boards. We can find nothing of any substance to support this charge; Madden testified that use of the boards was refused to both unions alike; if so, the company was within its rights. Finally, the Board criticizes the constitution of the "Independent" because it provided that an officer or member of any of the governing committees must be in the company's employ, so that if he were discharged, he ipso facto lost his place. Such a provision in the charter of the local of a national union would indeed be some evidence of company domination, but it does not seem to us to be ordinarily such in the case of an unaffiliated union. Unless such a union is so large as to require the employment of full-time officials, the most natural model is to choose the officers from its members, who must inevitably cease to be officers if they leave the company's employ. There is here indeed an opportunity for company domination, but no more than is inevitable in a union whose members are confined to company employees. In the case at bar we do not therefore count this as a factor of domination over the "Independent".

■■■ If the Board's order had to depend alone upon the two acts of discrimination against the local, which we have confirmed, it would somewhat tax our credulity to suppose that their effect was substantial; but we need not, and do not, put our decision upon that ground, for it seems to us that the situation is ruled by National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Company, 308 U.S. 241, 60 S.Ct. 203, 84 L.Ed. 219. There also there had been a "Plan" in which company representatives had participated, and which became unlawful after the passage of the Act; there also this "Plan"

had been succeeded by an unaffiliated union; though, unlike the case at bar, the company retained some measure of control over amendments to its constitution. The court thought this factor enough to condemn the union, but it did not rest its decision upon that alone; for it held that the successor ought to be "disestablished", even if this feature were removed. The reason for this was that, although the new union would be lawful, if freely formed, it had in fact arisen out of the earlier organization, and the company had done nothing to mark the separation between the two, and publicly to deprive the successor of the advantage of its apparently continued favor. It is true that in that case there was somewhat less separation between the old and the new than in the case at bar; the union was in form merely a "revision" of the earlier "Plan", and its constitution had been prepared in part at any rate, by executives of the company. But that was not the circumstance which counted, as we understand it; it was rather that the employees at large had not been advised that the company was wholly indifferent whether they joined the new union, and that, as it might, and probably did, appear to be a successor of the old, the separation should have been made plain, and with it the discontinuance of any continued countenance from the employer. The theory is that in cases such as this, where an unaffiliated union seems to the employees at large to have evolved out of an earlier joint organization of employer and employees, the Board may take it as datum, in the absence of satisfactory evidence to the contrary, that the employees will suppose that the company approves the new, as it did the old, and that their choice is for that reason not as free as the statute demands. How substantial such a fear really is, it is not for us to say; upon how much evidence the Board may insist to make public the change, the court did not declare; nor need we here; for the company did not make any effort to make it plain to the employees generally that the "Independent" was not a revision, or amendment, of the "Plan". On the surface it seemed to be such, for it emanated from the old elected representatives, and that alone established an appearance of continuity between the two. Madden's speech on May 12th was only to those representatives; the company did not seek to broadcast it or its equivalent

in any way to the employees—about 2,500 in all. So far as appears, it was content to let them assume, what was true, that the "Independent" had arisen out of the "Plan"; and to believe, as they quite naturally might have done, that it preferred the successor to the C.I.O. local just forming, and still very feeble. It is of course possible that it would have made no difference if the company had declared itself to all as Madden did at the meeting; but the Board was to decide how important that would have been; certainly it is not a question for us.

Therefore, quite aside from the two discriminations of the company against the local, the "disestablishment" of the "Independent" was within the Board's powers. It might insist that before an election should take place, the decks should be cleared of the "Independent", because it stood in the path of an untrammelled choice. (The suggestion that the examiner did not give the company a fair hearing does not deserve more than this allusion.) We see no reason therefore to disturb the Board's order, or not to enforce it, except in one particular. To post notices that the "Independent" has been "disestablished", and to say nothing more, may well lead the employees to conclude that any unaffiliated union will fall under the same ban. The same reason which demands its "disestablishment"—rigid impartiality between all kinds of organizations—demands public declaration that after it has been "disestablished", the field will be open for the employees' choice of any form they prefer. For this reason Article II (a) of the order will be modified by adding the following suffix: "but the employees are free to organize any union they choose, whether or not it is affiliated with a national union". As so modified, the order is affirmed, and an enforcement order may be entered.

Order as modified affirmed.

SWAN, Circuit Judge (dissenting).

I cannot agree that the Newport News case, supra, 308 U.S. 241, 60 S.Ct. 203, 84 L.Ed. 219, compels us to confirm the Board's order. There the personnel manager and general manager of the employer took part in the "revision" of the "Plan" and the drafting of a constitution for the union. Effective action by the union required agreement by the company and the constitution could not be amended if the company disapproved. Continuity between the old "Plan" and the recently organized union was plain. That is not true in the case at bar. On May 12th Madden told the employee members of the Joint Conference Committee that the old "Plan" was discontinued. He withdrew from the meeting and everything done thereafter in formulating the charter and by-laws of the "Independent" was done by the employees without suggestion or advice from any company representative. If employees who were former committeemen cannot take the initiative in forming an independent union, then it is difficult to imagine how a valid local organization can ever be formed; they are the natural leaders among the employees, for otherwise they would not have been elected representatives under the old "Plan". I do not see how any employer could have acted more scrupulously than did Westinghouse after announcing on May 12th that the "Plan" would no longer be recognized. That announcement was undoubtedly spread among the employees by those to whom it was made. If an employer keeps hands off and gives employees complete freedom to organize as they please, the mere fact that some employees may infer from the character of organization formerly existing that a local union will better please the management than one affiliated with a national labor body, should not justify a finding of employer domination or coercion. In my opinion there was no substantial evidence of company domination or coercion of the "Independent". In approving the Board's order on the authority of the Newport News case I think we are pushing the dicta of that opinion to unnecessary and undesirable extremes.