**E. I. DU PONT DE NEMOURS & CO. v. NATIONAL LABOR RELATIONS BOARD.**

**ASSOCIATION OF CHEMICAL EMPLOY-EES AT BELLE WORKS OF E. I. DU PONT DE NEMOURS & CO. v. SAME.**

Nos. 4674, 4697.

Circuit Court of Appeals, Fourth Circuit.

Dec. 27, 1940.

Robert S. Spilman and Hawthorne D. Battle, both of Charleston, W. Va. (Clyde M. Spargo, of Wilmington, Del., on the brief), for petitioner in No. 4674.

M. E. Boiarsky, of Charleston, W. Va. (Charles Ritchie, of Charleston, W. Va., on the brief), for petitioner in No. 4697.

Gerhard P. van Arkel, Atty., National Labor Relations Board, of Washington, D. C. (Robert B. Watts, Associate Gen. Counsel; Laurence A. Knapp, Asst. Gen. Counsel, Bertram Edises, and David C. Sachs, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

The E. I. du Pont de Nemours & Company (hereinafter called petitioner) has petitioned this Court to review and set aside an order issued by the National Labor Relations Board (hereinafter called the Board) against petitioner pursuant to Section 10(c) of the National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A. § 151 et seq. (hereinafter called the Act). The Association of Chemical Employees at Belle Works of E. I. du Pont de Nemours & Company (hereinafter called the A. C. E.) has also petitioned this Court to review and set aside this order. A C. E., in addition, has requested a review of a Direction of Election which the Board issued in the consolidated proceeding under Section 9(c) of the Act. In its answer to the petition in reference to Section 10(c) of the Act, the Board has requested that its order be enforced. Furthermore, the Board has filed a motion to dismiss the A. C. E.'s petition insofar as it requests a review of the Board's Direction of Election, or of any other action of the Board in connection with the representation proceeding.

Petitioner is a Delaware corporation engaged in the manufacture and distribution of chemical products. It operates seventy-eight plants located in twenty-seven states and admits that it is engaged in interstate commerce within the meaning of the Act. The instant controversy concerns petitioner's Belle plant, located at Belle, West Virginia, about ten miles East of Charleston. There are over one hundred buildings and over 2,000 employees at the Belle Plant. For the past twenty-five years, the Belle Plant (like all the other plants of petitioner) has not been subjected to any labor strikes.

The first of the three successive unaffiliated labor organizations formed at the Belle Plant was the Works Council, created in June, 1933. The Works Council was part of an employees' representation plan devised and suggested by petitioner in all of its plants. Under the suggested plan, the employee groups were to elect a representative from each of the departments into which petitioner's operations were divided; furthermore, an equivalent number of representatives were to be appointed by the management. The representatives were known as "councilmen" and composed the Works Council through which the plan was administered. The plan provided for automatic membership of the employees; no

dues; all expenses to be borne by petitioner. No provision was made for meetings of the general membership. The plan was adopted after a secret ballot of the employees in which 562 votes were cast in favor of, and 168 votes were cast against, the plan. Thus, for the first time in the history of the Belle plant, an employees' organization was introduced. Petitioner provided a meeting place on its premises and also furnished a secretary for the Works Council.

In the early part of March, 1937, an organizational campaign was begun at the Belle plant by District 50, Chemical Division of the United Mine Workers of America (hereinafter called the U. M. W.), a labor organization affiliated with the Congress of Industrial Organizations. To meet the challenge of this new group, the president of the Works Council, Seibert J. Toney, called a special meeting of the council for the purpose of selecting a committee to modify the existing organization so "that the Council would be in a stronger position." A committee of six, made up of three representatives appointed by employees and three management-appointed representatives, was designated to revise the plan. After working until midnight of the day of its appointment, this committee submitted a revised plan, designated the Employees' Council plan. The new plan was presented at a special meeting held the next day, March 12, 1937.

The Employees' Council plan differed from the Works Council plan in one material respect: namely, management-appointed representatives were eliminated. However, like the Works Council, it made no provision for any general assembly of the employees. The general manager of the Belle plant, J. L. E. Cheetham, advised the council that he would approve of the plan provided it was voted upon and accepted by the employees. The new plan was then explained to the employees on March 15, 1937 (the day of the annual Community Chest meeting), and an election was held among the employees on March 16-19. The election resulted in a vote of 2,418 in favor of, and 262 against the new plan. After ratification by petitioner on March 22, the Employees' Council plan was put into effect. The plan functioned actively until August 31, 1937.

The Board pointed out in its decision that contemporaneously with the efforts to revamp the Works Council, petitioner granted the employees a substantial wage increase. The Works Council had made a request on March 10, 1937, for a general increase of 10 per cent. On March 11, the U. M. W. organizational drive was announced in the newspaper, and as the Board stated, petitioner "forthwith announced an increase, not of 10 per cent, but of approximately 12.2 per cent, effective March 16, 1937."

In May, 1937, shortly after the decision of the United States Supreme Court in National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, which upheld the constitutionality of the Act, the members of the council began to wonder about the legality of the Employees' Council plan. Several councilmen approached the assistant general manager of the Belle plant, C. H. Doherty, and asked him to get them copies of the Act. The request was complied with in June, 1937; but, in answer to questions about the legality of the Employees' Council, Doherty told the councilmen that he could give them no advice, that (as he testified) "if they needed advice, to get an attorney because * * * (he) was neither competent nor permitted to interpret the plan for them." Cheetham called the Employees' Council into an informal session on June 10 and told the councilmen that petitioner's legal department in Wilmington, Delaware, was considering the validity of the Employees' Council. He further said that as manager of the Belle plant, he was perfectly willing to recognize the Employees' Council as the bargaining agent of the employees until more definite information could be obtained.

Oddly enough, the Board seemed to place emphasis on the fact that the councilmen were extremely concerned over the question of the legality of the plan. As the Board stated in its opinion: "Despite their outward manifestation of confidence in the legality of the Employees' Council plan, the councilmen apparently still were not fully convinced that their activities were 'legal.' They meanwhile studied the plans of other duPont councils and other unaffiliated organizations at their meetings in an effort to dispel their uncertainty. They also continued to question Cheetham and Doherty to determine whether or not there was any further information on the matter from Wilmington." Nevertheless, in order to have more concrete evidence of membership, the councilmen arranged in

July, 1937, for the general registration of all the employees in the Employees' Council.

Shortly after the registration, the U. M. W. filed a complaint with the Board to the effect that petitioner was dominating, interfering with, and lending support to, the Employees' Council. A field examiner of the Board, Ronald D. Stevenson, called on Doherty during the week of August 9, 1937. He told Doherty that the Employees' Council was under investigation and that some of its members had been questioned. Doherty gave him full information about the functions and operations of the council. Before speaking with Doherty, Stevenson had conferred with Toney, the president of the Employees' Council, and had advised him that it appeared that the plan was being maintained in violation of the Act. Toney later repeated this to Doherty and asked him for advice. As the Board noted in its decision, Doherty advised Toney: "I can give you no advice, as I told you when we gave you these copies of the law. I can't interpret the law nor can I give any information or advice on the Employees' Council Plan. If you men need an attorney you will have to get one."

A special meeting of the Employees' Council was called on August 16, 1937, at which time one of the councilmen reported the results of Toney's conferences, first with Stevenson and later with Doherty. A resolution was then adopted that a committee be appointed "to revise the Employees' Council plan, to gather any other information necessary to bring the plan into conformity with the Wagner Labor Act." A committee of three members was appointed, and, on the following day, the committee left the plant during working hours to consult with M. E. Boiarsky, an attorney. He advised them that since they were in his office during company time, he could not discuss the formation of a new organization. He also stated that he could not consult with them as a committee of an organization which previously had been company-sponsored; but that he would be willing to consult with them as individuals desiring to form a new organization, provided they came on their own, not on the company's, time.

On August 18, another special meeting of the Council was held. A report was given on the Boiarsky interview. After discussing different plans for a collective bargaining unit, the Council adopted the resolution that "the Committee appointed to revive the Council plan be instructed to continue with its work of revising the plan * * *." For their future policy, the councilmen resolved "that all meetings of the Council and of the Committee pertaining to the revision of the Employees' Council plan be held outside of working hours and off of the company property."

That same night, seven of the councilmen met in Boiarsky's office, where he reviewed for them the pitfalls to be avoided in the formation of the new organization. On August 25 and 26, the revision committee met at the Malden High School in Malden, West Virginia, for the purpose of considering various additional proposals for revision of the Employees' Council plan. During the course of these meetings, the committee prepared and adopted a constitution and by-laws for a new organization.

During the period of time that elapsed between the councilmen's meeting with Boiarsky and the committeemen's preparation of a constitution and by-laws, the petitioner was engaged in direct dealings with the Board's representative, Mr. Phillips, who had advised the petitioner by letter dated July 30, 1937, that the U. M. W. had filed a charge that the Employees' Council violated Section 8 (2) of the Act. On August 23, Cheetham and his counsel Clyde M. Spargo (a member of the legal department of the company at Wilmington), held a conference in Cincinnati with Phillips, and discussed the alleged violations. Phillips advised that he thought the Employees' Council was illegal because it met on company time and property; but that the matter could be amicably settled by petitioner's so informing the council and posting a notice that it would not bargain with the council in the future. Cheetham and Spargo stated that they would return to Wilmington and discuss the situation with petitioner's officers. At the second conference, held between the same parties on August 30, petitioner agreed to withdraw recognition from the Employees' Council and to disestablish it as the bargaining agency for the Belle plant. It was further agreed that petitioner would post two notices addressed to its employees, one in regard to disestablishment of the Employees' Council, the other containing the provisions of Sections 7 and 8 of the Act and a statement of the company's policy in respect to complying with these sections.

On the morning of August 31, Cheetham called the councilmen into his office and informed them that the petitioner would no longer recognize the Employees' Council plan. He told them of his interviews with Phillips and finally advised them that they could have the remainder of the day to settle the affairs of the Employees' Council during which they would receive their regular pay.

Following the meeting with the councilmen, petitioner immediately posted the notices as it agreed to do with Regional Director Phillips. The following notices, dated August 31, appeared on each of petitioner's forty bulletin boards:

"Notice to Employees

"The Director of the Regional Labor Relations Board at Cincinnati, after investigation, has informally advised the Management that the Belle Plant Works Council does not meet the requirements of the National Labor Relations Act (Wagner Act) as a collective bargaining agency of the employees of the Belle Works. For example, the Council, as it is now constituted, has been meeting on Company property and on Company time, which may be construed as Company assistance and hence contrary to the Act.

"In order that it may comply with the suggestion of the Regional Director, the Management is therefore unable to permit further meetings of the Belle Plant Works Council on Company property and on Company time, or to bargain collectively with it in the future.

"However, in accordance with its long established policy and as required by the Act, the Management will continue to receive and adjust grievances presented by any individual employee or any group of employees, and no employee will suffer any loss of time or pay while conferring with the Management in such cases.

"C. H. Doherty, Jr.,
"August 31, 1937.       Manager."
"Employees of Belle Works

"We have been requested by the National Labor Relations Board to post for your attention Sections 7 and 8 of the National Labor Relations Act, as follows:
(Sections 7 and 8 were then set out.)

"It is the policy of this company to comply in the fullest sense with this Act. There will be no discrimination, interference, restraint, or coercion by the company or any of its representatives against any employee because of membership or non-membership in any labor union.

"E. I. du Pont de Nemours & Co.,
"By C. H. Doherty, Jr.,
"August 31, 1937.       Manager."

Cheetham also discussed with Doherty and Evans the company's future policy as expressed in the posted notices. Doherty and Evans were instructed to pass the word down the line to all supervisory officials, from superintendents down to assistant foremen, to refrain from giving indications of partiality toward any labor organization and to avoid any expressions of opinion with respect to union matters. These instructions were personally transmitted by the various department heads of the company to each of their subordinates, who in turn conveyed them down through the entire organization.

On the afternoon of August 31—the day during which the notices were posted—Toney handed to Doherty a letter requesting petitioner to recognize the individual employees on the former Employees' Council as a collective bargaining agency "until such time as a bargaining agreement forthcoming from a new collective bargaining agent duly organized within the National Labor Relations Act do present such bargaining agreement to represent the employees of the said company." Doherty testified that he had refused this request inasmuch as the Employees' Council was no longer recognized by petitioner as the bargaining agent of the employees, and as there had been no opportunity for the employees to choose new representatives.

After Doherty refused recognition to the group which Toney represented, steps were taken in rapid succession towards the final formation of the new employees' organization. On this same day (August 31) the revision committee, appointed by the old Council, held a meeting at the Malden High School to complete the groundwork for the plan which had been nearly perfected at the meeting of August 26. The next day the tentative plan was taken to Boiarsky's office for a final revision and polishing. Boiarsky then suggested that each of the former councilmen invite six to eight employees from his department to attend a meeting for the purpose of discussing the proposed plan. This meeting was held on the night of September 2 at the Ruffner Hotel in Charleston and was attended by about fifty-three employees of petitioner. The assembly voted in favor of

forming a new organization. The previously prepared constitution and by-laws were read, considered, and, after minor changes, were adopted. All persons who signed the membership list at the meeting thereby became charter members of the A. C. E. They selected a temporary executive committee of nine men, six of whom were formerly members of the Employees' Council, to act as officers during the thirty-day period preceding the election of permanent officers.

On September 25, 1937, a mass-meeting was held at the Armory in Charleston as a part of the campaign to enlist members for the A. C. E., and for the specific purpose of electing permanent officers and executive committeemen. Some three or four hundred employees attended, and voted six of the nine former councilmen back into office. The membership drive actively continued through the month of October, 1937, when the newly-formed A. C. E. made a request that petitioner give it recognition as the exclusive bargaining agency for the employees at the Belle plant.

On October 14, 1937, the U. M. W., for the first time, and the A. C. E. each made individual requests that it be given recognition as the exclusive bargaining agent. Petitioner asked that each submit evidence that it represented a majority. Though the U. M. W. refused to submit any such evidence, the A. C. E., on November 1, submitted cards showing that it represented approximately 1,400 employees. These cards were checked against petitioner's payroll and it was found that the A. C. E. had a very slight majority (50.2%) of eligible employees. However, because the majority was so narrow and because there was an outstanding claim by the U. M. W., petitioner refused to recognize the A. C. E. then as the exclusive bargaining agency. Inasmuch as the A. C. E. has not submitted additional evidence of its majority support, petitioner has not as yet given it recognition. Thus, neither union has ever been recognized by petitioner as the agent of its employees for purposes of collective bargaining.

Upon charges filed by the U. M. W., the Board issued its complaint dated May 19, 1939, against petitioner alleging that petitioner had engaged in, and was engaging in, unfair labor practices affecting commerce within the meaning of Section 8(1) and (2) and Section 2(6) and (7) of the Act. In respect to the unfair labor prac-

tices, the complaint alleged in substance that petitioner, through its officers and agents, had dominated and interfered with the formation and administration of the Works Council, the Employees' Council and the A. C. E., each of which organization was alleged to be the same as the others "and/or the successor of each others"; that petitioner had discouraged its employees from becoming or remaining members of the U. M. W.; and that, by these and other acts, petitioner had interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in Section 7 of the Act. Petitioner filed its answer on June 15, 1939, admitting certain allegations of the complaint, but traversing others and making certain allegations by way of an affirmative defense.

On October 19, 1938, the U. M. W. filed a petition alleging that a question had arisen concerning the representation of employees of petitioner and requesting an investigation and certification of representatives pursuant to Section 9(c) of the Act. On April 25, 1939, the Board, acting pursuant to Section 9(c) of the Act and Article III, Section 3, of the N. L. R. B. Rules and Regulations—Series 1, as amended, ordered an investigation and authorized the Regional Director to conduct it and to provide for an appropriate hearing upon due notice. Acting pursuant to Article III, Section 10(c) (2) and Article II, Section 37 (b) of said Rules and Regulations, the Board further ordered that the representation proceedings and the proceedings with respect to the alleged unfair labor practices be consolidated for the purposes of hearing. On June 1, 1939, the Regional Director granted a motion of the A. C. E. to intervene in the proceedings.

A hearing was held at Charleston, West Virginia, from June 22 through August 4 1939, before Berndon M. Bell, the Trial Examiner duly designated by the Board. In his Intermediate Report, filed on November 28, 1939, the Trial Examiner found that petitioner had not engaged in unfair labor practices within the meaning of Section 8 (2) of the Act with respect to the formation of the A. C. E.; but that petitioner had engaged in, and was engaging in, unfair labor practices within the meaning of Section 8 (1) and (2) and Section 2 (6) and (7) of the Act with respect to the formation and administration of the Works Council and the Employees' Council. He accordingly recommended that petitioner

cease and desist therefrom and that petitioner cease giving recognition to, and also disestablish, the Works Council and the Employees' Council as the representatives of any of its employees.

Both the U. M. W. and petitioner filed exceptions to this Intermediate Report and both, on February 29, 1940, presented oral arguments before the Board. In a decision filed on June 22, 1940, the Board found, inter alia: (1) petitioner has engaged in, and is engaging in, unfair labor practices within the meaning of Section 8(2) of the Act by dominating and interfering with the administration of the Works Council and with the formation and administration of the Employees' Council and the A. C. E.; (2) petitioner has engaged in, and is engaging in, unfair labor practices within the meaning of Section 8(1) of the Act by interfering with, restraining, and coercing its employees in the exercise of the rights guaranteed in Section 7 of the Act. Upon the basis of its findings of fact and conclusions of law, the Board ordered petitioner to cease and desist from engaging in the unfair labor practices, to disestablish the Works Council, the Employees' Council, and the A. C. E., and to post appropriate notices. Furthermore, the Board issued a Direction of Election pursuant to Section 9(c) of the Act for the purpose of selecting either the U. M. W. or the West Virginia State Federation of Labor, an affiliate of the American Federation of Labor, as the employees' bargaining agency. No provision was made for the inclusion on the ballot of the A. C. E.

Petitioner admits that under the terminology of Section 8(2), the Works Council and the Employees' Council were not valid bargaining agencies. However, petitioner insists that it had withdrawn recognition from both these organizations almost two years prior to the hearing in this case and had "disestablished" these organizations under specific directions of the Board's representative. Petitioner, finally, urges that inasmuch as there is no substantial evidence to support the finding of the Board that it has either dominated or interfered with the formation or administration of the A. C. E., in violation of the Act, or that it has interfered with its employees in the exercise of the rights guaranteed to them by Section 7 of the Act, this Court should set aside and refuse to enforce the final order of the Board. We are of the opinion that petitioner's position is sound; and that there is no substantial evidence to support the Board's findings that petitioner has either interfered with the formation and administration of the A. C. E., or has violated Section 8(1) of the Act by interfering with the rights guaranteed in Section 7 to its employees.

Under our analysis of the various problems involved in this case, the main issue to be decided is whether or not on August 31, 1937, petitioner had effectively "disestablished" the Employees' Council and, by thus "wiping the slate clean", had left the way open for the formation of a bona fide bargaining agency. Such other issues as are herein involved may arise only if we answer the "disestablishment" question in the affirmative; for if we deny that there has been a "disestablishment", the Board will be affirmed and it will not be necessary to consider other related problems.

■ It is no longer open to question that where an employer has been found to have violated Section 8(2) of the Act, the Board may order a "complete disestablishment of the existing organization." National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 1939, 308 U.S. 241, 251, 60 S.Ct. 203, 208, 84 L.Ed. 219. See also National Labor Relations Board v. Falk Corp., 1940, 308 U.S. 453, 60 S.Ct. 307, 84 L.Ed. 396; National Labor Relations Board v. Pacific Greyhound Lines, 1938, 303 U.S. 272, 58 S.Ct. 577, 82 L.Ed. 838; National Labor Relations Board v. Pennsylvania Greyhound Lines, 1938, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307. Furthermore, where an employer, without any public disavowal of a previously company-dominated union, has silently stood by and watched a new organization grow out of the smoldering ashes of the old union, "disestablishment" of the second organization may still be ordered. Cf. National Labor Relations Board v. Falk Corp., supra. The question remains, however, as to just what action must be taken by an employer to "disestablish" effectively an old company-dominated organization and to free thereby both himself and any newly-formed organization from later condemnation by the Board. Although it seems that the Supreme Court has not furnished a precise and specific answer to this problem, there are yet many decisions of the different Circuit Courts of Appeals

to serve as guides. Compare Humble Oil & Refining Co. v. National Labor Relations Board, 5 Cir., 1940, 113 F.2d 85, and Magnolia Petroleum Co. v. National Labor Relations Board, 5 Cir., 1940, 112 F.2d 545, with Bethlehem Shipbuilding Corp. v. National Labor Relations Board, 1 Cir., 1940, 114 F.2d 930, and Westinghouse Electric & Mfg. Co. v. National Labor Relations Board, 2 Cir., 1940, 112 F.2d 657.

From a study of the history of this case, as this history has been previously outlined, it seems apparent to us that petitioner had decided by August 30, 1937, to sever its relationships with, and to withdraw its recognition from, the Employees' Council. From July 30, 1937, when petitioner was first informed of the charges filed by the U. M. W., to August 30, 1937, petitioner insisted that the Employees' Council was a bona fide bargaining agency within the meaning of the Act and was truly representative of the free choice of the employees. However, on the last-named date, petitioner accepted the Board's informal ruling to the contrary by notifying Regional Director Phillips that it would withdraw recognition from the Employees' Council and would publicize the "disestablishment" by posting the aforementioned notices. The substance of these notices must have met the Board's approval, inasmuch as they grew out of the negotiations between the representatives of the Board and the representatives of the petitioner. Furthermore, petitioner had no reason to question the validity of the form and contents of these notices; for, up until May 19, 1939, when the Board's formal complaint was issued, no objection to these notices had ever been voiced by any of the Board's representatives.

On August 31, 1937, the day after the agreement was made with Phillips, Cheetham met with the councilmen of the Employees' Council and informed them that petitioner would no longer recognize the Employees' Council as the bargaining unit. He arranged for the stipulated notices to be posted and then discussed petitioner's future policy with the two keymen in the Belle plant, Doherty and Evans. Through these two officers of petitioner, all supervisory officials were carefully notified to refrain from giving indications of partiality towards any labor organization and to avoid any expressions of opinion with respect to union matters. Later the same day, Doherty refused recognition to a group on the grounds that its representatives were not chosen by the employees. If we are to seek a turning point in the affirmed policy of the petitioner, and petitioner urges that such turning point does exist, we cannot but fix upon August 31, 1937, the very date of the alleged manifestation of "disestablishment."

We have examined the notices that were posted on August 31 in an effort to determine definitely whether or not they clearly expressed petitioner's intentions and future policy in reference to labor organizations. We are irresistibly led to the conclusion that petitioner's employees were frankly, fairly and plainly informed of the true position of petitioner. One of the notices clearly states that petitioner is "unable to permit further meetings of the...Council on Company property and on Company time, or to bargain collectively with it in the future." No statement need be made as to the clear meaning of these words. The Employees' Council was thereby declared to be defunct as a bargaining agency. But, rather than leave its employees- with this bare statement, petitioner added to this notice the further fact that it stood ready then, as it always had in the past, to "continue to receive and adjust grievances presented by any individual employee or any group of employees. * * *" The second notice, after quoting Sections 7 and 8 of the Act for the benefit of the employees, ended with the statement that petitioner fully intended to comply with the Act and would not discriminate against any employee "because of membership or non-membership in any labor union." We believe that it would be extremely difficult to draft notices which would more impartially or more directly express petitioner's intention to comply fully with the provisions of the Act.

Obviously, under a different set of facts, the mere posting of well-drawn notices might not be sufficient to accomplish the "disestablishment" of a previously company-dominated union. However, the posting of such notices is certainly of the strongest probative force in showing that the field was cleared of the original illegal growth and was thus rendered suitable for sowing the seeds of an undominated body. Cf. Magnolia Petroleum Co. v. National Labor Relations Board, supra (written notice); Humble Oil & Refining

Co. v. National Labor Relations Board, supra (written and oral notice). As Judge Arant observed in H. J. Heinz Co. v. National Labor Relations Board, 6 Cir., 1940, 110 F.2d 843, 847: "If petitioner had really wanted its employees to know that they might with safety join whichever union they desired, the bulletin boards were the obvious and, because direct, the most effective means of assuring them of its impartiality." Hence, in the light of the meticulous care taken by the employees in the formation of the A. C. E., and in the light of the clean-cut policy carried out by petitioner after August 31, 1937, we are of the opinion that the posting of the notices on all the forty bulletin boards was a sufficient public expression of a "disestablishment" of the Employees' Council and was an adequate means of assuring the employees of an absolute freedom of choice in their selection of a collective bargaining agency. All the surrounding facts and circumstances tend strongly to prove petitioner's utmost good faith in effecting this "disestablishment".

The Board has cited many cases in support of its position. We believe that on their facts they are all clearly distinguishable from the instant case. In the Supreme Court decisions in National Labor Relations Board v. Falk Corp. and National Labor Relations Board v. Newport News Shipbldg. & Dry Dock Co., both cited supra, the Board's "disestablishment" order was affirmed. In both these cases, however, the employer had never made any concrete form of public disavowal of the original company-dominated union; but, rather, changes were merely made within the existing organization without any definite manifestation by the employer that there would be no domination or discrimination in the future. Cf. International Ass'n of Machinists v. National Labor Relations Board, 1939, 71 App.D.C. 175, 110 F.2d 29, affirmed by Sup. Ct., 61 S.Ct. 83, 85 L.Ed. ——, on November 12, 1940; National Labor Relations Board v. Brown Paper Mill Co., Inc., 5 Cir., 1940, 108 F.2d 867; National Labor Relations Board v. H. E. Fletcher Co., 1 Cir., 1939, 108 F.2d 459. The opinion of the Supreme Court in the International Machinist case, supra, was obviously based upon the discrimination practiced by the employer in tacitly approving the A. F. of L. unit and in subtly opposing the C. I. O. In Westinghouse Electric & Mfg. Co. v. National Labor

Relations Board, 2 Cir., 1940, 112 F.2d 657 and in Kansas City Power & L. Co. v. National Labor Relations Board, 8 Cir., 1940, 111 F.2d 340, the decisions turned upon the fact that, while the employer had notified the governing boards of the original company-dominated unions as to their illegalities, the employer had yet made no public—oral or written—disavowal of these company-dominated unions, and had issued no public declaration of neutrality.

The Circuit Court of Appeals for the Second Circuit relied heavily upon the Newport News Shipbuilding case, supra, in reaching its conclusions in Westinghouse Electric & Mfg. Co. v. National Labor Relations Board, supra. In explaining the Newport News Shipbuilding case, Judge Learned Hand stated (112 F.2d 657, at page 660): "Although the new union would be lawful, if freely formed, it had in fact arisen out of the earlier organization, and the company had done nothing to mark the separation between the two, and publicly to deprive the successor of the advantage of its apparently continued favor. * * * the employees at large had not been advised that the company was wholly indifferent whether they joined the new union, and that, as it might, and probably did, appear to be a successor of the old, the separation should have been made plain, and with it the discontinuance of any continued countenance from the employer."

It is our belief that petitioner, in the instant case, has completely fulfilled all the conditions set out in Judge Hand's statement.

The case of Humble Oil & Refining Co. v. National Labor Relations Board, supra, is factually quite similar to the instant case. The employer in the Humble Oil case, had issued a written as well as an oral announcement that the old company-dominated union was no longer recognized and that the provisions of the Act were to be applied. In reversing the Board's findings, the court stated that the oral and written announcements "made it entirely plain that the field was clear for the men to do what they pleased, and that the company would not take, or permit any of its representatives to take, any hand in any employee organization." 113 F.2d at page 89. The court then held that there had been a total and final "disestablishment" and that the Humble Oil & Refining Company had not violated Section 8(2) of the Act.

■ Stripped of all surplusage, the ultimate position of counsel for the Board seems to be that though an employer had issued public statements of neutrality and though he had clearly manifested his intentions of adhering to the policy defined by the Act, ·an employer would still be deemed to have violated the express terms of the Act where his employees through "habit" selected an organization closely. parallel in form to the original company-dominated union. In short, the Board appears to maintain that though an employee be fully informed of·his statutory rights, he will be given yet further protection where he has acted recklessly in the exercise of these rights. This position, however, is predicated upon the viewpoint that labor, as a group, is docile and uninformed. We cannot accept this fundamental position.

■ We are of the opinion that the labor group is now quite aware of its statutory rights, and·is instilled with an aggressive spirit that, before the passage of the Act, may long have been kept dormant. The still picture of a sheep-like body of laboring men, placidly led by a dominating employer, is not representative of the true situation. Since the passage of the Act, the picture has been quite effectively streamlined. · We see today a mobile labor force, strengthened by statutory safeguards, working on comparatively even terms with the employer, who may often owe his particular strength to a superior economic, educational and social position. Under this view of the modern industrial situation, we surely cannot indulge in any assumption of weakness on the part of the employee; certainly we cannot vary the specific terminology of the Act to meet these alleged weaknesses. As Judge Hutcheson admirably stated in Magnolia Petroleum Co. v. National Labor Relations Board, supra, 112 F.2d at pages 549, 550: "It [the Act] nowhere provides, and there is no warrant in it for the view, that preference by em-. ployees for an unaffiliated as against a nationally affiliated organization, raises a presumption that this preference was coerced or bought by the employer. Indeed, *the statute goes on exactly the contrary presumption, that employees have the intelligence and character requisite for self-organization, either by joining an existing labor organization or forming one of their own.*" (Italics ours.)

■■ If we were to accept the Board's interpretation, as set forth in its brief and oral argument, of the scope of the Act, we would be tacitly affirming the alleged power of the Board to test the practical *effectiveness* of a labor organization, even though the organization be admittedly free from employer domination or interference. We find no basis in any section of the Act for the power thus claimed. Rather, we agree with Judge Sibley that "the Board is not made either guardian or ruler over the employees, but is only empowered to deliver them from restraint at the hands of the employer when it exists." Humble Oil & Refining Co. v. National Labor Relations Board, supra, 113 F.2d at page 88.

When, in his oral argument, the Board's counsel urged an "apparent inconsistency" in the terminology of the Act, he evidently recognized the extreme position taken by the Board; for, if his analysis was correct, the Board would be established as a licensing bureau for labor organizations. It would then sit as a board of censors in testing the form and effectiveness of each labor organization brought to its attention. It would then possess the power, where a particular organization did not meet its approval, to order periodic "disestablishments". When the Supreme Court stated that "disestablishment * * * may be the only effective way of wiping the slate clean", we do not believe that the Court meant to empower the Board to use this remedy where the employer, after disavowing the old organization, had clearly, honestly and publicly assured his employees of a new deal; and a square one. Cf. National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., supra, 308 U.S. at page 250, 60 S.Ct. 203, 84 L.Ed. 219.

■ The Board concluded in its decision that the chief organizers of the A. C. E., who were in the main the former councilmen of the Employees' Council, "performed the task that the respondent (petitioner, in this appeal) wanted accomplished." We do not believe that there is substantial evidence in the record to support either this conclusion or the other conclusions which refer to the organizers of A. C. E. as petitioner's "tools". The Board must have reached these conclusions by tying together the facts that the A. C. E. had been rapidly formed in an effort to defeat the intrusion of the U. M. W.; that the em-

ployees who were the leaders in the company-dominated Employees' Council had taken the initiative in the formation of the A. C. E.; that the constitution of the Employees' Council was the basis for that of the A. C. E. (although the new version provided for monthly dues, meetings only on the employees' time and off company property, the right to strike, the submission of disputes to the Board, etc.); and that Doherty had suggested that the employees see a lawyer. However, evidence similar to this has often been held not sufficiently substantial to support a finding of company-domination. See L. Greif & Bro., Inc. v. National Labor Relations Board, 4 Cir., 1939, 108 F.2d 551; cf. Ballston-Stillwater Knitting Co., Inc. v. National Labor Relations Board, 2 Cir., 1938, 98 F.2d 758. See, also, Virginia Electric & Power Co. v. National Labor Relations Board, 4 Cir., 115 F.2d 414, decided by this Court on November 12, 1940; National Labor Relations Board v. Mathieson Alkali Works, Inc., 4 Cir., 1940, 114 F.2d 796. We believe that the evidence in the instant case is not only insufficient to nullify the validity of petitioner's manifestation of "disestablishment", but that this evidence is also insufficient to support a finding of company domination over, or interference with, the A. C. E.

The evidence that was gathered to demonstrate petitioner's "psychological" control and to illustrate a formation by "habit", merely painted the picture of a typical employee-group attempting to organize an unaffiliated bargaining unit. The alteration of an old constitution, the leadership of former officers, the request for advice from an honest employer and his neutral statement to the employees that they should see a lawyer, the necessity of haste in order to preclude affiliated organization, are all part of a familiar pattern. See Magnolia Petroleum Co. v. National Labor Relations Board, supra, 112 F.2d at page 552; cf. Ballston-Stillwater Knitting Co., Inc. v. National Labor Relations Board, supra. The interests of the employees and of a fair-dealing employer are not mutually exclusive. The concern over heavier dues, sympathetic strikes, and outside leadership might, with other factors, very well, and frequently does, prompt a particular employee-group to prefer the same type of organization that is also preferred by the employer. And where the interests of employee and employer do really coincide,

which seems to be true in the instant case, it is a warping of the true facts to refer to the leaders of the employees as the "tools" of the employer.

■ We do not interpret the Act as absolutely requiring employees to adopt a militant attitude in the exercise of their guaranteed rights. The declaration of policy in Section 1 of the Act, 29 U.S.C.A. § 151, makes it adequately clear that Congress was, and is still, seeking a "friendly adjustment of industrial disputes". In L. Greif & Bro., Inc. v. National Labor Relations Board, supra, Judge Soper stated (108 F.2d at page 558): "It goes without saying that the determination of the employees to form their own association and to be free from the outside interference of a national union was influenced by their past experience in the plant, and by the general opinion in the community of which they are a part; but these contacts did not deprive them of their rights under the Act, or require them to choose bargaining representatives offensive to their employer or to their fellow citizens, so long as their choice was not dominated or interfered with by the employer."

■ In concluding the discussion of our views on the "disestablishment" phase of the instant case, we think it appropriate to observe that we do not regard "disestablishment", in reference to labor organizations, as having any precise, technical meaning. We are not here dealing with the "dissolution" or "reorganization" of complex corporate structures. We are concerned with individual rights and human relationships as defined by a sweeping statute. So long as the employee is adequately and carefully protected in the rights guaranteed by Section 7 of the Act, we are not concerned with the exact technical form of a "disestablishment". So long as the employees are publicly assured by the employer in genuine good faith of his neutrality and impartiality, we believe that the fundamental purpose of the Act is fulfilled.

■ In its finding of violations of Section 8(1) and (2) of the Act, the Board pointed to the use of a "confidential list" by one of the organizers of the A. C. E., and to certain isolated and unrelated utterances hostile to outside unions, made by different supervisory officials of petitioner. Without going into the credibility of the testimony of the Board's chief witness, we are of the opinion that these utterances

and the use of the list were not of a nature sufficiently substantial to support a finding of the suggested unfair labor practices. Cf. National Labor Relations Board v. Mathieson Alkali Works, Inc., supra. The "potent imponderables permeating this entire record" seem to make it clear that petitioner has not in these instances, committed any violation of the Act. Petitioner had specifically instructed its officials and supervisory employees to refrain from giving indications of any partiality and to avoid any expressions of opinion in reference to union matters. Again, the record contains no substantial evidence of any discrimination against the U. M. W. and in favor of the A. C. E. The charge in the original complaint that petitioner had discriminated against its employees was stricken out by the Trial Examiner at the close of the Board's case. Furthermore, in a lay-off of over 1,300 employees, there was no complaint whatever of any discrimination against employees owing to union activities. It is worthy of note that, out of more than 2,000 employees, only about half a dozen testified that any of the approximately 275 supervisory employees of petitioner had ever made proscribed statements indicating hostility to affiliated unions.

This Court, in Martel Mills Corp. v. National Labor Relations Board, 4 Cir., 1940, 114 F.2d 624, 633, 634, recently dealt with an alleged violation of Section 8(1) through sundry statements of supervisory employees. We stated therein: "In the absence of evidence of any policy of proscribed discrimination, an employer should not be held strictly accountable for every isolated utterance of a policy-making officer concerning union activities. * * * And, where the conduct and actions of the employer fail to indicate any violation of the Act, an assemblage of unrelated, unconnected expressions of opinion does not very deeply impress this Court."

And as Judge Parker stated in National Labor Relations Board v. Mathieson Alkali Works, Inc., supra, in considering an alleged violation of Section 8(2) (114 F.2d at page 799): "Sporadic activities on the part of foremen, however, not authorized by the employer and not resulting in interference with or domination of the right of the employees to organize and select bargaining representatives of their own choosing, should not be allowed to nullify a choice freely made by a majority of the employees acting on their own initiative." Our views as to the effect that is to be given to evidence of various unrelated statements are amply set out in the Martel Mills and Mathieson Alkali cases, supra. See also Virginia Electric & Power Co. v. National Labor Relations Board, supra.

We believe, for the reasons stated above, that the entire order of the Board in reference to petitioner should be set aside and that the petition to enforce it should be dismissed. Inasmuch as we are of the opinion that there has been a bona fide "disestablishment" of the Works Council and the Employees' Council, and a creation of the A. C. E. by the free and fair choice of petitioner's employees, the affirmative and negative order of the Board in reference to the A. C. E. will not be enforced. Furthermore, though we recognize that petitioner admitted that it had violated Section 8(2) in respect to the Works Council and the Employees' Council, we think it quite unnecessary to enforce the Board's order in its application to the Works Council and the Employees' Council. The Supreme Court has pointed out that "Sec. 10(c) was not intended to give the Board power of punishment or retribution for past wrongs or errors." National Labor Relations Board v. Newport News Shipbldg. & Dry Dock Co., supra, 308 U. S. at page 250, 60 S.Ct. at page 208, 84 L. Ed. 219. An enforcement of the Board's order against the Works Council and the Employees' Council, after their complete "disestablishment", would be punitive in nature, rather than preventative, and, in our opinion, would go beyond the plain meaning of Section 10(c) of the Act. Cf. Consumers Power Co. v. National Labor Relations Board, 6 Cir., 1940, 113 F.2d 38, 43; National Labor Relations Board v. Piqua Munising Wood Products Co., 6 Cir., 1940, 109 F.2d 552, 557. See, also, Humble Oil & Refining Co. v. National Labor Relations Board, supra.

For our views as to the cease and desist order in its reference to petitioner's practices prior to the "disestablishment" of the Works Council and the Employees' Council, we need only repeat what Judge Parker succinctly stated in the Virginia Electric & Power case, supra [115 F.2d 423]: "We recognize, of course, that it is for the Board and not us to decide upon the order necessary to remove the effect of an unfair labor practice found to have occurred; but where, as here, the order of

the Board is predicated upon other matters, as to which it is reversed, cease and desist provisions, which clearly would not have been made in their absence, ought not to be enforced because of an incidental finding as to an unfair labor practice of minor character which has long since ceased to be operative or to have any effect." The Works Council and the Employees' Council are dead, with seemingly not even any illusory prospects of a resurrection. Certainly no useful purpose would be served here by "whipping a corpse".

 The petition of the A. C. E. for a review of the Direction of Election, which the Board had issued in a proceeding under Section 9(c) of the Act, must be dismissed under the authorities of National Labor Relations Board v. Falk Corp., supra, American Federation of Labor v. National Labor Relations Board, 1940, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347, and National Labor Relations Board v. International Brotherhood of Electrical Workers, 1940, 308 U. S. 413, 60 S.Ct. 306, 84 L.Ed. 354. It is true, as counsel for the A. C. E. points out in his reply brief, that these cases are in a sense distinguishable, inasmuch as "the instant proceeding is one where the entire record, including both the complaint case and the representation case, has been certified by the Board to the Court." Nevertheless, we believe that our decision is controlled by Mr. Justice Black's statement that a Circuit Court of Appeals "has no right to review a proposed election and in effect to supervise the manner in which it shall thereafter be conducted." National Labor Relations Board v. Falk Corp., supra, 308 U.S. at page 459, 60 S.Ct. at page 311, 84 L.Ed. 396. Under our understanding of the powers granted to this Court pursuant to Section 10(f) of the Act, we may exercise our statutory authority to review an order for election if, but only if, the Board, subsequent to the election, has made a final order predicated upon the results of such election. See Sen. Rep. 573, Committee on Education and Labor, 74th Cong., 1st Sess., p. 14, quoted in American Federation of Labor v. National Labor Relations Board, supra, 308 U.S. at page 410 n. 3, 60 S.Ct. at page 304, 84 L.Ed. 347. In view of our decision herein, the Board will doubtless revise its ruling as to the organizations to be voted on in the election.

For the foregoing reasons, the order of the Board in regard to petitioner is set aside and the petition to enforce it dis-

missed. The petition of the A. C. E. for a review of the Direction of Election is also dismissed.

Reversed.