**SOUTHERN ASS'N OF BELL TELEPHONE EMPLOYEES v. NATIONAL LABOR RELATIONS BOARD.**

**SOUTHERN BELL TELEPHONE & TELE-GRAPH CO. v. SAME.**

**Nos. 10076, 10078.**

Circuit Court of Appeals, Fifth Circuit.

June 30, 1942.

James A. Branch and Frank A. Hooper, Jr., both of Atlanta, Ga., for petitioner in No. 10076.

Marion Smith, E. W. Smith, and John A. Boykin, Jr., all of Atlanta, Ga., for petitioner in No. 10078.

Robert B. Watts, Gen. Counsel, National Labor Relations Board, and Ernest A. Gross, Associate Gen. Counsel, National Labor Relations Board, both of Washington, D. C., for respondent in both cases.

Before HUTCHESON, HOLMES, and McCORD, Circuit Judges.

HUTCHESON, Circuit Judge.

This is another proceeding of the kind which, in form a complaint by the Board against the employer, is in design and substance an attack upon an unaffiliated organization, hereafter called Association, formed and chosen as representative by an overwhelming majority of the employees, the membership at the time of the hearing being 17,775 out of a possible eligible list of 20,000, in favor of a nationally affiliated labor organization which wants to organize and represent them. It has its spring in the successful efforts of the national organization as a part of its organizational campaign to enlist the Board as accuser.[1]

Its result, if the Board as accuser has been advocate enough to induce itself as judge to decide the issue wrongly, that is, contrary to the real, the free wishes of the employees whose rights and not the rights of labor organizations it is the purpose of the statute to protect, will defeat the employees in the exercise of the very rights the act guarantees them.[2] Because this is so the Association has intervened, vigorously denying the charges of company dominance, and as vigorously asserting, that it represents the free action and choice of the employees. Since therefore the order bears heavily not on the

[1] The controversy here is not as in so many cases of this kind, one of long drawn out protest of and objection to the unaffiliated organization with the company sponsoring one and opposing the other organization. Upon this record until 1940, no objection or protest was ever voiced by any of the employees. Then it was that a few employees at Shreveport alone, undertook with the help of Mr. Williams, president of the Louisiana State Federation of Labor and of Mr. Walker, International representative of the International Brotherhood of Electrical Workers, to perfect an Electrical Workers Local Organization at Shreveport. A conference between Mr. Williams, Mr. Walker and a group of Shreveport telephone operators, was held in Mr. Williams office and a charter was applied for, for a Shreveport local, and the local was installed on December 4th. Almost immediately thereafter on December 17, 1940, Walker, as part of his campaign for organization, filed with the Board a charge and on January 15, 1941, an amended charge, covering not merely the Shreveport employees who had contacted him but all of the employees throughout the Southern Bell Telephone System in the States of North Carolina, South Carolina, Florida, Georgia, Alabama, Mississippi, Louisiana, Tennessee and Kentucky. The charge was: that the company on or about August 26, 1935, sponsored and caused to be formed among its employees a labor organization, to-wit, the Association; that contracts are in effect between the respondent and the Association covering all the units of respondent's operations; and that because of the respondent's domination of the Association, all such contracts now in effect are invalid. The Board sponsoring the charge, filed a complaint, determined it against the Association and now seeks enforcement of its order of disestablishment.

[2] " 'It is hereby declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection. (July 5, 1935, c. 372, § 1, 45 Stat. 449).' Sec. 151, Title 29 U.S.C.A.", Note 5, page 549, 112 F.2d.

employer but on the employees, it may not be too carefully kept in mind nor too often declared that what the statute defines and prohibits as an unfair labor practice on the part of the employer, is not an atmosphere of friendliness, a sense of mutual interest between employer and employee.[3] What it enjoins the employer not to do, is (1) to interfere with, restrain or coerce employees in the exercise of their rights to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or for their mutual aid and protection, and (2) to interfere with the formation or organization of any labor organization or contribute financial or other support to it. · It nowhere provides, and there is no warrant in it for the view, that preference by employees for and their selection of an unaffiliated as against a nationally affiliated organization, raises any presumption that this preference was coerced or purchased by the employer. Indeed the statute goes on a presumption exactly the contrary of this, that employees have the intelligence and character requisite for self-organization either by joining or assisting a labor organization, or forming one of their own. We and other courts[4] have pointed out the dangers to the guaranteed rights of employees inherent in a procedure which permits one of the organizations striving for the mastery over the other, to obtain the sponsorship of the Board and enlist it as accuser to, in effect, prosecute the other organization before the Board as judge.[5] And we and other courts have made it clear that in its capacity as accuser the Board under the genius of our institutions is held to the same burdens and obligations of proof as any other litigant who takes the affirmative. It may not, by accusing, put the accused upon proof. As accuser it must prove its charge. In its capacity as a trier of facts the Board stands on the footing of a jury. Like a jury it must be impartial. Like a jury it may not make findings without evidence to support them, and as in the case of a jury it is for the courts to say whether there is or is not evidence in support. When it is clear as here that the material evidence is entirely without dispute, that, in short, the ultimate, or what the Board calls its concluding, findings are based not upon conflicting but upon non-conflicting evidence,[6] our determination as to whether the Board's findings must stand or fall, must not rest upon whether the Board deems that the inferences it drew are supported by substantial evidence. It must rest upon the determination by this court, under the settled rules which govern jury verdicts, whether the undisputed facts are in law capable of fairly giving rise to the fact inferences the Board has drawn, that is, whether reasonable minds having no interest as accuser or otherwise in the result but wholly impartial, could, upon the evidence, have legally and fairly drawn the fact inferences, made the fact findings, which the Board did make.

■ Further, while the act authorizes the Board if it shall find that any person is engaging in any unfair labor practice, to issue an order requiring such person to cease and desist therefrom, and to take such affirmative action * * * as will effectuate the policies of this chapter, we[7] and other courts from the beginning have pointed out that the functions of courts in

---

[3] "We do not interpret the Act as absolutely requiring employees to adopt a militant attitude in the exercise of their guaranteed rights. The declaration of policy * * * makes it adequately clear that Congress was, and is still, seeking a 'friendly adjustment of industrial disputes.'" Dupont Co. v. N. L. R. B., 4 Cir., 116 F.2d 388, 399.

[4] Magnolia Petroleum v. N. L. R. B., 5 Cir., 112 F.2d 545; Humble Oil & Refining Company v. N. L. R. B., 5 Cir., 113 F.2d 85; Dupont v. N. L. R. B., 4 Cir., 116 F.2d 388; Staley Mfg. Co. v. N. L. R. B., 7 Cir., 117 F.2d 868.

[5] We have pointed out that the statute does not make "the Board * * * either guardian or ruler over the employees, but is only empowered to deliver them from restraint at the hand of the employer when it exists." Humble Oil v. N. L. R. B., 5 Cir., 113 F.2d 85, at page 88.

[6] The evidence in the case is lengthy but free from substantial conflict. The disagreement between Board, petitioner, and the intervenor, is not over what the record establishes as done and said, but over the Board's conclusions as to the effect under the act of what was done and said.

[7] N. L. R. B. v. Bell Oil & Gas Co., 5 Cir., 91 F.2d 509, at page 514; N. L. R. B. v. Ford Motor Co., 5 Cir., 119 F.2d 326, at page 330; N. L. R. B. v. Dixie Motor Coach Corp., 5 Cir., 128 F.2d 201.

the operation of the act is by no means perfunctory. Upon them rests the final judicial responsibility. From them emanates the sole authority for making the Board's orders coercively effective. This doctrine of the respective function of court and Board as fixed in the statute has been affirmed and re-affirmed by the Supreme Court.[8] The statute, Section 160 (e) provides that the jurisdiction of the appropriate court of appeals shall be exclusive and its judgment and decree shall be final subject only to review by the Supreme Court. In Southern Steamship Company v. N. L.R.B., 62 S.Ct. 886, 894, 86 L.Ed. ——, April 6, 1942, the Supreme Court has recently given vital support to this view. Setting aside an order of the Second Circuit Court of Appeals enforcing an order of the Board, reinstating certain striking sailors, the court said: "Section 10 (c) of the National Labor Relations Act * * * permits the Board to require an employer who has committed an unfair labor practice to take 'such affirmative action, including reinstatement of employees * * *, as will effectuate the policies of the Act (this chapter).' This authorization is of considerable breadth, and the courts may not lightly disturb the Board's choice of remedies. But it is also true that this discretion has its limits, and we have already begun to define them. National Labor Relations Board v. Fansteel Metallurgical Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599; Republic Steel Corp. v. National Labor Relations Board, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6. A complete definition of course was not and could not have been attempted in those cases. Nor will it be attempted here. *It is sufficient for this case to observe that the Board has not been commissioned to effectuate the policies of the Labor Relations Act so single-mindedly that it may wholly ignore other and equally important Congressional objectives. Frequently the entire scope of Congressional purpose calls for careful accommodation of one statutory scheme to another, and it is not too much to demand of an administrative body that it undertake this accommodation without excessive emphasis upon its immediate task.* This was the kind of

consideration for which the present case called." (Italics supplied.)

■ It is therefore for this court before ordering enforcement of the Board's order, in the performance of its function under the statute to determine for itself not blindly but in the exercise of an informed discretion, first, whether the findings are supported by the evidence and second, whether the Board's orders are, within the reasonably broad discretion conferred by the act, appropriate to effectuate its policies, or constitute an abuse of that discretion.

■ Examining the Board's concluding findings, and its order, in the light of these principles and of the record in the case, we think it clear that its conclusion that petitioner dominated and interfered with the administration of the Association and interfered with, restrained and coerced its employees in the exercise of their guaranteed right of self-organization and the choice of their bargaining representative, is without support in the evidence. We think it clear too that the. order of the Board requiring the company to withdraw recognition from and disestablish the Association as representative of the employees is not an exercise but an abuse of the discretion confided in it. It is not appropriate to effectuate, it defeats the policies of the act. For to give it effect will, on evidence not at all supporting the conclusion drawn, deprive the employees who have overwhelmingly and freely formed and chosen the Association as their representative, in the exercise of their rights of self-organization of the very rights the statute was enacted to guarantee to them. No case has been cited to us, we have found none, where the record is so completely lacking in any evidence of anti-union activities, anti-union bias on the part of the employer; none where it shows such scrupulous recognition, such earnest efforts to ascertain and abide by the obligations imposed by the act, and such complete avoidance of any act or word from which domination or interference by the employer could be inferred; none in which there was such complete absence of even an atmosphere of seated purpose or preference for one labor

---

[8] Consolidated Edison Co. v. N. L. R. B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; N. L. R. B. v. Fansteel Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599; N. L. R. B. v. Newport News, etc., Co., 308 U.S. 241, 60 S.Ct. 203, 84 L.Ed. 219; Republic Steel Corp. v. N. L. R. B., 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6; N. L. R. B. v. Bradford Dyeing Ass'n, 310 U.S. 318, at page 342, 60 S.Ct. 918, at page 930, 84 L.Ed. 1226.

organization over the other, or for any; none in which the evidence more positively and beyond question showed that the employees had freely and without any interference, coercion, restraint or even persuasion, on the part of the employer, selected their bargaining representative. There is no claim that the company has ever discriminated against any employee or organization of employees on account of any labor activities or on account of an employee joining or not joining any labor organization. There is no claim that it or any of its supervisory personnel has in any wise intimidated, coerced or used force or threats thereof, or offered any inducements to any of its employees for or on account of any of its employees' labor organizational activities, or on account of any of them joining or not joining any labor organization. Indeed, during the trial of the case when the company's counsel was undertaking affirmatively to prove that nothing of the kind had ever occurred, the attorney for the Board, made the following statement: "Mr. Examiner, I object to all of these things. The complaint here is clear and charges one thing, that is, domination of the Association and I have not charged and do not now charge and will not charge that the company has discriminated against any employee for union membership or that it has violated any section of the Act other than 8 (1) and 8 (2)." The proof makes it completely clear; that since the passage of the Act, the company and its employees have sedulously endeavored to conform to it, and that except in respect of one or two acts of minor officials, which were promptly repudiated, there has been no departure by the company or any of its employees from this attitude; that the old Association has been completely superseded by the present one, formed under a new constitution; that the company, because of the effort at organization of the rival union, declined to recognize the Association further without an election; and that there was an election with an overwhelming number of the employees, more that 4/5ths of the whole, voting for the Association. Notwithstanding these undisputed facts, the Board's position, consistently maintained throughout the litigation, first as accuser, next as judge, and now as suitor litigant seeking a decree of enforcement, is simply this, that the Association was and remained tainted and could not represent the employees because there had been no sufficiently clean break away from the old, to establish a new Association, by a complete dissolution and abandonment of the old and a fresh start from scratch. In short, the Board, extracting from statements made in opinions of this court and the Supreme Court appropriate to the cases,[9] but on facts wholly different from these, a rigid formula, and standing upon its application here, insists that only by compliance with such formula can the company taint be purged, a new start made. The statute prescribes no such formula.

[9] In N. L. R. B. v. Newport News, 308 U.S. 241, 250, 60 S.Ct. 203, 208, 84 L.Ed. 219, the court affirming the right of the Board to enter an order disestablishing an Association as representative when that was the only way to purge it of company influence, said, "As pointed out in N. L. R. B. v. Pennsylvania Greyhound Lines, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307, disestablishment of a bargaining unit previously dominated by the employer may be the only effective way of wiping the slate clean and affording the employes an opportunity to start afresh in organizing for the adjustment of their relations with the employer." The same thing is true of N. L. R. B. v. Falk Corp., 308 U.S. 453, 60 S.Ct. 307, 84 L.Ed. 396; Heinz Co. v. N. L. R. B., 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309; N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L. Ed. 368.

In our case, N. L. R. B. v. Brown Paper Mill Co., 5 Cir., 108 F.2d 867, 871, it appeared that in the beginning of an organizational campaign by a nationally affiliated labor union the management frankly declared, that it never had had and does not want to have its men organized, and it took a hand in effectively organizing the local Association and beating the union drive. Under those flagrant circumstances of interference and coercion, we said: "The statute recognizes two parties to a labor bargaining compact. It requires that the employees in bargaining be completely independent of the employer so that in the bargaining, labor will be represented by persons or organizations having only its interest in mind, and acting wholly uninfluenced by fear or favor, of or from the management. Therefore, when once it appears that management has had a hand in organizing, supporting or in any wise interfering or collaborating with an 'association' of employees, such an association may not be recognized as the free and voluntary association of employees called for in the act. If in such cases the employees really intend and want it to be

Neither the Board nor the courts may do so. Whether an Association chosen by the employees is or is not company dominated or supported or if it began that way, has been purged of that taint, must be determined in each case on its own facts. Similar attempts in two quite recent decisions to decide cases under the Wage & Hour Act by formulas were rejected by the Supreme Court. In Kirschbaum v. Walling, 62 S.Ct. 1116, 1118, 86 L.Ed. ——, June 1, 1942, where the question was whether the case was within the Act, the court said: "To search for a dependable touchstone by which to determine whether employees are 'engaged in commerce or in the production of goods for commerce' is as rewarding as an attempt to square the circle. The judicial task in marking out the extent to which Congress has exercised its constitutional power over commerce is not that of devising an abstract formula. * * * What was said about a related problem is not inapposite here: 'Whatever terminology is used, the criterion is necessarily one of degree and must be so defined. This does not satisfy those who seek for mathematical or rigid formulas.'" In Walling v. A. H. Belo Corp., 1942, 62 S.Ct. 1223, 1228, 86 L.Ed. ——, where the question was the validity of a contract fixing the regular rate of pay, the court said: "The problem presented by this case is difficult—difficult because we are asked to provide a rigid definition of 'regular rate' when Congress has failed to provide one. Presumably Congress refrained from attempting such a definition because the employment relationships to which the Act would apply were so various and unpredictable. And that which it was unwise for Congress to do, this Court should not do." Discarding then the Board's formula on which its decision rests and considering the case from the standpoint of the effect of the evidence to establish that at the time of the complaint and hearing, the Association was dominated or fostered by the company, and there was therefore not a free choice of the employees, we think it plain that the inference the Board drew is without support in the evidence, its concluding finding may not stand. Further if we could agree with the Board that something yet was lacking, to purge the Association of company support, and that the acts of the supervisory employees at Shreveport, though they were completely ineffective and were stopped when brought to the company's knowledge, constituted attempts at interference chargeable to the company, we should still decline to enforce the order as one not effectuating but tending to defeat the policies of the Act and therefore an abuse of discretion. As these are expressed in the preamble, Sec. 151 and in Sec. 157, 29 U.S.C.A., they are (1) "the friendly adjustment of industrial disputes", and (2) the protection of employees in their rights of self-organization and representation. They are not the promotion of one union over another.[10] Here, the evidence showing that an overwhelming number of the employees had organized and chosen the Association as representative, instead of ordering the company to cease and desist from the interferences found or at most making the order applicable alone to the Shreveport office, the Board's order required the disestablishment of this Association as representative of the employees, not only Shreveport, the only place where any employee had shown a desire for any other representation but at all the offices and establishments where there was none. The sole effect of the enforcement of such an order at this time and under the circumstances now confronting this country, would be to throw the company and the employees generally into a state of turmoil and confusion incident to a general organizational campaign. For the court upon this evidence at this time and under these circumstances, to decree its enforcement would be completely contrary to the policy of the Labor Relations Act as well as to public policy generally.

The order of the Board is vacated and set aside. The Petition for Enforcement is denied.

such, their only sure course is to disestablish it as the bargaining agency and, entirely dissolving it, begin organization anew, upon their own time and their own devices without aid or comfort from the management."

[10] In N. L. R. B. v. Brown Paper Mill Co., 5 Cir., 108 F.2d 867, at page 872, we said, "Respondent makes a good deal of the fact that one of the Brotherhood dealers admits that it brought the charges for the purpose of helping its organizational campaign. * * * The point that the Brotherhood may benefit or lose by this proceeding is not material to it. The law is not concerned with what organization employees may form or join. It is concerned only with seeing that that joining is free from company interference, influence or support."