**NATIONAL LABOR RELATIONS BOARD**
**v. THOMPSON PRODUCTS, Inc., et al.**

No. 10116.

Circuit Court of Appeals, Sixth Circuit.

June 5, 1947.

Harold A. Cranefield, of Washington, D. C. (Gerhard P. Van Arkel, Morris P. Glushien, A. Norman Somers, Ida Klaus, and Fannie M. Boyls, all of Washington, D. C. on the brief), for petitioner.

E. B. Schwartz, of Cleveland, Ohio (Stanley & Smoyer, of Cleveland, Ohio, on the brief; Welles K. Stanley, Harry E. Smoyer, and Eugene B. Schwartz, all of Cleveland, Ohio, of counsel) for respondent.

Before ALLEN, MARTIN, and MILLER, Circuit Judges.

ALLEN, Circuit Judge.

This case arises upon a petition for enforcement of an order of the National Labor Relations Board which found that the respondents, Thompson Products, Inc. (hereinafter called TP), and Thompson Aircraft Products Company (hereinafter called TAPCO), engaged in unfair labor practices in violation of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., and disestablished two alleged company unions.

TP is a manufacturer of airplane and automotive parts, doing business in Cleveland, Ohio, at several plants of which the principal one is the Clarkwood plant. In 1941 TP, with the financial backing of the Defense Plant Corporation of the United States, formed TAPCO, a wholly-owned subsidiary of TP, for the manufacture of airplane and automotive parts in a new plant at Euclid, Ohio, some eight miles from the Cleveland plant. From May, 1941, until December, 1941, TAPCO operated in the Railway Building in Cleveland. Thereafter operations were begun at Euclid, and employees were gradually transferred from Cleveland to Euclid and put to work at TAPCO, together with increasing numbers of new employees. The number of transferees from TP and of new

employees at TAPCO during the succeed-ing months is shown by the following table:

| Month | Newly Hired Employees | Transferred from TP (Approximate) | Total TAPCO Payroll |
|---|---|---|---|
| 5-22-41 | 14 | 32 | 46 |
| 6-19-41 | 0 | 40 | 35 |
| 7-31-41 | 172 | 38 | 210 |
| 8-28-41 | 207 | 16 | 243 |
| 9-25-41 | 244 | 26 | 270 |
| 10-23-41 | 245 | 29 | 274 |
| 11-30-41 | 275 | 51 | 326 |
| 12-18-41 | 329 | 152 | 481 |
| 1- 1-42 | 362 | 1,594 | 965 |
| 1-29-42 | 420 | 687 | 2,310 |
| 2-26-42 | 480 | 131 | 3,972 |
| 4-23-42 | 667 | 59 | 4,490 |
| 5-21-42 | 347 | 52 | 4,823 |

The total as of April 23, 1942, of newly-hired men was 3,415. The total of trans-ferees from TP on that date was 2,845.

An organization unaffiliated with any union had been previously formed at TP and disestablished by an order of the Board issued August 1, 1941, which was modified in certain respects and enforced by this court in National Labor Relations Board v. Thompson Products, Inc., 130 F.2d 363, August 28, 1942. This organization, de-nominated the Automotive and Aircraft Workers Alliance, Inc., is hereafter called the A&AWA. In May, 1941, after TAPCO began operations, a movement for an inde-pendent organization at TAPCO was insti-tuted. This organization was denominated Aircraft Workers' Alliance, Inc. (herein-after called AWA). After the disestab-lishment of A&AWA, another independent organization was formed at TP, called the Brotherhood of Independent Workers, Inc. (hereinafter called BIW).

The Board found that TP and TAPCO had engaged in unfair labor practices, in violation of the Act, in that they dominated and interfered with the formation and administration of AWA and BIW and contributed support to them in violation of the Act, discriminatorily laid off 6 em-ployees and discharged 2 employees, and thereby, as well as by other acts and con-duct, interfered with, restrained and co-erced their employees in the exercise of the rights granted by § 7 and § 8 of the Act.

As to BIW, the latest independent organi-zation formed at TP, respondents do not challenge the finding of the Board. This organization was never given a contract by TP and was recognized for collective bar-gaining purposes only under the require-ment of the War Labor Board. Respond-ents attack the order which disestablishes AWA and directs the reinstatement of Er-win Baur and Kenneth Wilson, and orders reimbursement to five employees of wages which would normally have been earned during the time of a layoff. As to these phases of the case, respondents urge that the order is not supported by substantial probative evidence.

### Disestablishment of AWA.

The Board ordered disestablishment of AWA because in its formation and opera-tion, including its conduct at the election of May 1, 1942, AWA did not validly re-flect the employees' free choice of elective representatives. The respondents contend that this finding has no substantial support in the record, and hence a detailed con-sideration of the facts on this subject is required.

AWA had been formed primarily by members of A&AWA who had been trans-ferred from TP to TAPCO and desired representation at the Euclid plant. Through their attorney, Milton Roemisch, who was also attorney for A&AWA, they sent a written demand to the management of TAPCO on November 18, 1941, that AWA be recognized as the exclusive union repre-sentative, and given a contract. At the request of TAPCO the membership cards were checked against the TAPCO payroll of December 4, 1941, by a certified public accountant, who certified that AWA repre-sented 201 out of 265 hourly-rated em-ployees. On December 18, Roemisch and the representatives of AWA met with the TAPCO management, and an exclusive contract between AWA and TAPCO was executed shortly thereafter.

The CIO had filed a petition in Decem-ber, 1941, claiming that A&AWA at TP in Cleveland was dominated and coerced by the management. This petition was withdrawn within a few days. The re-spondents contend, and the regional di-rector of the Board in effect admits that TP was not notified of the petition. On

January 12, 1942, an amendment to the original petition was filed by the CIO, which for the first time charged unfair labor practices with reference to the formation of AWA and BIW. These proceedings, by common consent, were held in abeyance until a plant-wide election, both at TP in Cleveland and TAPCO in Euclid, was held under the supervision of the Board on May 1, 1942. The Board had refused to allow A&AWA to intervene in the election proceedings or to have its name placed upon the ballot, upon the ground that it had previously issued an order disestablishing this association. It permitted the International Association of Machinists, A F of L, and the CIO to have their names on the ballot. The A&AWA thereafter advised its adherents to vote in the election for "neither." At the election, the result of the vote was as follows:

(1) At TP 1288 for the UAW-CIO
 87 for the IAM
 2510 for "Neither"

(2) At TAPCO 2249 for the AWA
 1203 for the UAW-CIO
 134 for "Neither"

The following facts are either found by the examiner, by the Board, or are undisputed in the record. It is specifically found by the examiner that the movement which resulted in the formation of AWA was instituted because the TP management refused to bargain with A&AWA on matters pertaining to employees transferred to TAPCO. George Wrost, secretary of A&AWA, consulted with Roemisch, attorney for A&AWA, about this situation in the spring of 1941, and Roemisch advised an independent union, and asked Wrost to sound the men out on this subject. Wrost reported that they were agreeable, and Roemisch, who, as the Board found, had represented several independent unions and had a personal interest in so doing, gave Wrost a copy of the articles of incorporation of AWA and got him to secure five incorporators. Wrost took the incorporators to see Roemisch, stayed a few moments, and never again attended a meeting of the new organization. No records of A&AWA were given to AWA, and no A&AWA representatives other than Wrost ever attended a meeting.

It is undisputed that Roemisch and Wrost did not consult with management as to this project. Roemisch stated categorically that he never had any conference with management about the formation of AWA. In the organization meetings he repeatedly told the men that there would be "a new union" at TAPCO; that it would not be affiliated with A&AWA, and invited the employees, if transferred to TAPCO, to join AWA. It was generally understood by the men that the union at TAPCO was distinct from A&AWA, and unaffiliated with it. Board witnesses repeatedly spoke of the "new union" being formed at TAPCO, and of the fact that it had no affiliation whatever with the organization at TP.

It is undisputed that Roemisch warned the men not to let management know anything about AWA, and the feeling of the men that the organization was not identical with A&AWA was expressly shown in the minutes of a meeting of the officers and stewards of AWA on February 6, 1942, which reads as follows:

"A question was put relative to the complaints of the workers by F. Manning. Workers transferred to TAPCO from Main Plant wanted credit for dues they paid to the A&AWA at the Main Plant. Heated discussion followed and all stewards were instructed to impress upon new TAPCO workers that this Union had nothing to do with the other organization. Each Steward was advised to meet C.I.O. competition for members by, if necessary, waiving dues for the first three months to transferred workers."

The examiner found that the incorporation was complete in June or July, 1941. He concluded upon the above facts that Roemisch was acting in the interest of management in forming AWA; but the Board set aside this finding, declaring that Roemisch was "not in TP's or TAPCO's employ or control," and that he had "a direct interest of his own in sponsoring unaffiliated organizations." Trustees were appointed for AWA, Roemisch was au-

thorized to prepare a constitution which was later adopted, and as stated above a written demand for an exclusive contract between AWA and TAPCO was sent to TAPCO. The majority being established by the certified count, TAPCO management gave AWA the exclusive contract to represent the men at the Euclid plant. This association was not ordered disestablished until the order of the Board was issued in the instant case upon August 4, 1944, and therefore, during the entire period under scrutiny, AWA was the duly established union representative of the employees at TAPCO.

The CIO claimed no interest in organizing TAPCO until January 12, 1942, and the contract with AWA was executed December 6, 1941, as found by the Board; that is prior to the entry of CIO into the field.

 Although this record is devoid of evidence of financial support, coercion, domination, or even connection of management with AWA in its formation, the Board concluded that the formation of AWA by members of A&AWA (the TP disestablished organization) and what it called "premature recognition" of AWA by TAPCO, and the giving of an exclusive contract to this organization constituted domination, interference, and coercion under the statute. There is no warrant (in the statute) for this conclusion. The primary purpose of the enactment of the National Labor Relations Act was to give employees the right to self-organization and "the right * * * to bargain collectively through representatives of their own choosing." 29 U.S.C. § 157, 29 U.S. C.A. § 157. The statute does not provide that the bargaining process between employer and employee must be delayed until an election is ordered by the Board. The right to representation exists prior to the holding of an election and must be recognized whenever it is found that an organization represents a majority of the employees. When it was shown early in December that some four out of every five employees were members of AWA, TAPCO was bound to recognize that organization and to give it the exclusive con-

tract. National Labor Relations Board v. Arma Corp., 2 Cir., 122 F.2d 153. The fact that AWA was quickly formed and promptly recognized is not unfair labor practice. Keystone Steel & Wire Co. v. National Labor Relations Board, 7 Cir., 155 F.2d 553. The fact that certain of the men who formed AWA had been active at TP in A&AWA did not establish that AWA was sponsored and dominated by the employer. Foote Bros. Gear & Machine Corp. v. National Labor Relations Board, 7 Cir., 114 F.2d 611. The employees had a right to be friendly or hostile to any labor organization and their attitude should have been of no concern to the Board. A. E. Staley Mfg. Co. v. National Labor Relations Board, 7 Cir., 117 F.2d 868, 875. The rights of employees to join a great international union, to organize a so-called "inside union" or to refuse to join or create, or assist any labor organization, are of equal value, and in administering the National Labor Relations Act, each is entitled to the protection of the National Labor Relations Board. National Labor Relations Act, § 7, 29 U.S.C. § 157, 29 U.S. C.A. § 157. National Labor Relations Board v. Sterling Electric Motors, Inc., 9 Cir., 109 F.2d 194, 202. As excellently declared in De Bardeleben v. National Labor Relations Board, 5 Cir., 135 F.2d 13, 15:

"It cannot be too often stated that the purpose of the act is to leave the employees with a free choice. It is not to subject them to the compulsion of their employer, outside labor union, the Labor Relations Board or anybody else as to what is their best interest in joining or forming labor organizations. Because this is so,, it cannot be too often stated by the courts that the fact that workers choose unaffiliated associations is in itself no evidence whatever that those associations are not 'genuine unions' or that the choice is dominated, interfered with or coerced."

 The mere fact that men who were being transferred from TP disliked the affiliated union is no evidence that they were acting for or under the domination of management. National Labor Relations Board v. Swank Products, Inc., 3 Cir., 108

F.2d 872, 875; Southern Ass'n of Bell Telephone Employees v. National Labor Relations Board, 5 Cir., 129 F.2d 410. The employees transferred from TP to TAPCO were entitled to prompt arrangements for representation. They could not secure seniority rights nor have their grievances handled in the new company unless and until they were represented; and this required the establishment of an organization of their own choosing. These men had a right to form a union at TAPCO consonant with their view if they had a majority of the employees, even if they had been members of A&AWA. The Board's interpretation of the statute on this point would practically preclude former members of A&AWA from forming an organization of their own choosing.

 Both AWA and CIO waived dues for a period in order to make their membership attractive. The CIO announced that no dues would be collected until it secured a contract. It is undisputed that A&AWA members did not automatically receive membership in AWA upon transfer to TAPCO. They had to sign membership cards in AWA. AWA credited all dues paid prior to January 1, 1942, to the first quarter of 1942, and allowed transferees from TP to sign authorization cards which entitled them to be represented by AWA up to the beginning of the dues-paying period. The Board found that this was evidence of identity between AWA and A&AWA, although the similar practice of waiver of dues with exactly the same purpose was followed by the CIO and not condemned by the Board. The practice was legitimate alike for the CIO and AWA.

 Nor is the arrangement as to retention of seniority rights by transferees from TP to TAPCO evidence of illegality. This arrangement consisted of an agreement between A&AWA and TP as to what seniority rights should be retained in case of transfer, and having been ratified and written into the contract between AWA and TAPCO management, was found by the Board to be evidence of violation of the statute. This conclusion was legally erroneous. One of the main reasons for immediate organization at the Euclid plant was the question of the cutting off of seniority rights of old TP employees. Very substantial economic benefits were attached to seniority rights. The men at each plant had a right to contract with reference to seniority rights, and the fact that AWA assented to such an arrangement in no way detracted from its legality.

 Moreover, there was no discrimination between the CIO and AWA as to solicitation of membership on company premises. It was permitted to all organizations except during working hours. The Board found that the members "of all competing organizations" engaged in union activity during working hours. At both TP and TAPCO the CIO solicited at all times. This is shown by the testimony of fourteen witnesses for the Board. Typical is the statement by Harrigan that he solicited everywhere, and by Chiapetta to the effect that they talked union matters during working hours, some for A&AWA and some for CIO, and were never reprimanded for that talk.

 Nor was it illegal for AWA, when charged with unfair labor practice and attacked in an election, to cooperate with A&AWA in fighting the CIO. It was to the advantage of each organization to be the exclusive representative of the employees in the respective plants, and each organization had a legal right to coordinate its campaign with that of the other for votes in its favor.

### The Election.

The Board set aside the result of the election of May 1, 1942. While it is not the province of this court to review that finding and to set aside the order nullifying the election (National Labor Relations Board v. Falk Corp., 308 U.S. 453, 458, 60 S.Ct. 307, 84 L.Ed. 396), the examiner's report and the decision of the Board with reference to the disestablishment of AWA are based to such an extent upon the manner in which they considered the election was conducted that we must discuss it in its bearing upon the charges of unfair labor practice. The Board found that TP and TAPCO interfered with, restrained and coerced their employees into not joining and assisting the CIO "by issuing a

series of 'Let's Have the Truth' and other bulletins and notices, * * * by interfering with the election and thereby in effect campaigning against the U.A.W.-C.I.O. and the I.A.M.," and by celebrating their defeat.

■ Prior to the election Hugh E. Sperry, regional director of the Board, conferred with the management of TP and TAPCO and with Roemisch as representative of A&AWA, and laid down rules for the conduct of the election. A&AWA asked to be permitted to intervene in the election. This request was refused on the ground that A&AWA had been ordered disestablished by the Board, although the case was pending in this court on petition for enforcement. However, in addition to refusing to allow the name of A&AWA on the ballot and to permit it to intervene in the proceedings, a matter which was within the jurisdiction of the Board to decide, Sperry went further and beyond any authority which he or the Board possessed under the statute. He ordered A&AWA not to campaign in the election, declaring that he would consider the campaign of A&AWA the "same as though the company campaigned." Roemisch stated that A&AWA would campaign, and this both Sperry and the Board considered to be defiance of an order of the Board. Neither Sperry nor the Board was authorized to order the organization or its individual members not to take part in the campaign.

■ The Board, upon a proper finding of domination by the employer, was authorized to order the disestablishment of A&AWA. National Labor Relations Board v. Dow Chemical Co., 6 Cir., 117 F. 2d 455. The order is addressed to the employer, and requires him to withdraw recognition of the union disestablished as a bargaining representative. National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 267, 270, 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307. If the employer withdraws recognition as a bargaining representative and effects complete cessation of support and encouragement, financial or otherwise, he has complied with an order of disestablishment.

Cudahy Packing Co. v. National Labor Relations Board, 8 Cir., 102 F.2d 745, certiorari denied, 308 U.S. 565, 60 S.Ct. 78, 84 L.Ed. 475. But the order must not be construed as in any wise limiting·the employee's freedom of choice as to a labor organization or bargaining agent. Colorado Fuel & Iron Corp. v. National Labor Relations Board, 10 Cir., 121 F.2d 165, 176. In accordance with this principle, this court has modified a decree of disestablishment in order to set forth the right of employees to join an organization of their own choosing. National Labor Relations Board v. Precision Castings Co., Inc., 6 Cir., 130 F.2d 639, 643.

■ The members of the disestablished organization are not deprived of a right to vote in labor elections nor to campaign in those elections; and for these legitimate purposes they have a right to be represented by the organization. The Board is not authorized to prohibit an organization which is disestablished from acting lawfully. Although the Board had decided that A&AWA could no longer function lawfully as bargaining representative, it was its constitutional right to express a preference in the election.

■ The Board could not disfranchise any employee in an election, nor could it forbid him to express his opinion about an election. The Board had no more power to forbid members of A&AWA and their organization to try to induce other employees to vote as they desired than it had actually to forbid members of A&AWA to vote. Moreover, when Sperry announced that participation in the campaign by A&AWA would be considered the action of management, he prejudged a question upon which he had no authority to act judicially and upon which the Board would not have been authorized to form or to announce a decision in advance of a hearing. This statement added to the tension. The disorder and confusion which existed at the election and was stressed by the Board resulted not only from the vigorous campaign waged by all groups, but from the resentment caused by the dictatorial orders issued by Sperry and not repudiated by the Board.

There is no substantial evidence that the management at TAPCO did not give the fullest cooperation in this election. Respondents were eager to have the turmoil resulting from union controversy ended in order that the war work might go forward in full tide of production, and therefore on February 27, 1942, they issued the following order:

"As per orders issued some time ago, there is to be no distrubution of any literature on Thompson Products Co. property by Thompson Products Co. employees or any one else.

"The same rule will apply to the Thompson Aircraft Products Co. property.

"Therefore, you will instruct all the sergeants and guards of Plant Protection Dept. to prohibit anyone from distributing hand bills, pamphlets or any kind of literature whatever, regardless of the nature, in the Tapco Plant or on Tapco properties surrounding the Plant, without permission of the Personnel Division through the Plant Protection Dept.

"Further, instruct your men to confiscate all literature that may be passed out on these properties, or which may be attempted to be passed out.

"Any member of the Plant Protection Dept. seeing or hearing of a complaint of literature being distributed in violation of the above orders, and who does not take the necessary action to prevent same, will be held responsible and suffer the consequences."

Sperry complained that bulletins were posted in the plant, in violation of his orders. The few bulletins posted, fairly read, were in compliance with the orders of the Board, or constituted legitimate answers to unwarranted attacks upon management. Moreover, whatever bulletins Sperry ordered removed were immediately removed. He testified that the management, both at TP and TAPCO, gave him complete cooperation. True, thousands of men were campaigning vigorously and feelings naturally ran high. Election material of all organizations, CIO, AF of L, A&AWA and AWA, handed out outside the plants, was brought into the plants. Individual men electioneered: but every

order or request made by Sperry was observed by management. Sperry himself removed some A&AWA and AWA material, but never removed CIO papers or shirts.

The Board found that TAPCO assisted the AWA in the election campaign by distributing Old Guards buttons, reading "Old Guards say vote and win with AWA." A similar button reading "Old Guards say vote neither" was distributed at TP.

██ The Old Guards was a welfare organization of employees who had worked for the respondents at least five years, sponsored and supported by the management. Shortly before the election thousands of the buttons appeared at both TP and TAPCO. The assistant office manager at TAPCO had told the men where they could get these buttons, and had signed a personal order agreeing to vouch for their payment. The Board found that management participated in the payment for these buttons. There is no substantial evidence to support this finding. The president of the Old Guards published a statement saying that the buttons had been ordered by individual members of the association, but not by the organization. This statement was not contradicted, and is supported by a letter written by R. S. Livingston, secretary of the Old Guards, who was also connected with TAPCO management. The Board found that management did not disavow sponsorship of the buttons; but this letter, signed by Livingston and undisputed, is a disavowal. The only way that management was connected with the buttons except for the fact that Bonner, a subordinate official, had signed a personal guaranty for men whom he knew, is the circumstance that management had sponsored the Old Guards; but the officers of the Old Guards, one of whom was from TAPCO management, completely disavowed sponsorship of the buttons. The manufacturer who took the order testified that he extended credit on the personal letter of Bonner, and not on the credit of the Old Guards of TP or of TAPCO. They were paid for not by management, but by cash in coins of small denominations. The fact that management did not disapprove the display of the buttons, stressed by the examiner, is also immateri-

al. The management had no more right to prohibit the use of these buttons than of a CIO button, or of a CIO shirt.

▇▇▇ Similarly, the use of the particular bulletins found by the Board to constitute an unfair labor practice was not illegal. The bulletins contained true statements of facts as to wages earned and as to seniority arrangements, and gave the respondents' version of events at the plants which had been described in unfavorable terms by the union. The Friendly Forum, the TAPCO plant paper, stated that AWA had been "formally recognized by the Board," and this was considered an unfair labor practice. But the statement was not untrue. The placing of the name of AWA on the ballot was a formal recognition by the Board that AWA had legitimate standing as a labor organization.

Certain of the bulletins were answers to statements made by the CIO over the radio and in its publication, attacking management. Typical of the statements answered was that of the April 30, 1942, issue of the TP Organizer, a CIO publication, which carried an item headed "Company Prints the AWA and AAWA Filth Sheets." Sperry investigated this question personally, and ascertained that there was no truth in this charge, but he said nothing to the CIO about it. Among other things, under the heading "Let's Have the Truth," the respondents bulletin stated:

"The Lie—'We charge F. C. Crawford, president of Thompson Products, as being Un-American, subversive, Pro-Axis, and an enemy of our country.' "

"The Truth—This is a blackguard statement, arousing the resentment of employees,—civic, educational and charitable leaders, and high government officials who have first-hand knowledge of Mr. Crawford's beliefs and achievements."

"The Lie—'The Company * * * also indulges in the lowly chiseling thievery of short changing your pay.' "

"The Truth—This scurrilous remark is a reflection on the honesty and character of each and every one of the hundreds of counters, timekeepers and payroll clerks who make out the pay, as well as the Company."

The respondents were not required under the law to permit these attacks to go unanswered, for the right of free speech is enjoyed by employers as well as by employees. Midland Steel Products Co. v. National Labor Relations Board, 6 Cir., 113 F.2d 800, 804; National Labor Relations Board v. Ford Motor Co., 6 Cir., 114 F.2d 905. The Board did not question the truth of the statements made in respondent's bulletins.

No threat of discharge and no element of coercion was contained in these publications, and their issuance could not, under the United States Constitution, be held to violate law. Midland Steel Products Co. v. National Labor Relations Board, supra; National Labor Relations Board v. Ford Motor Co., supra. The fact that they were issued in answer to direct attacks constitutes a further justification. Press Co., Inc., v. National Labor Relations Board, 73 App. D.C., 103, 118 F.2d 937, certiorari denied, 313 U.S. 595, 61 S.Ct. 1118, 85 L.Ed. 1548; National Labor Relations Board v. Brown-Brockmeyer Co., 6 Cir., 143 F.2d 537; National Labor Relations Board v. J. L. Brandeis & Sons, 8 Cir., 145 F.2d 556; cf. National Labor Relations Board v. West Kentucky Coal Co., 6 Cir., 152 F.2d 198.

▇▇▇ A fair reading of this record establishes by undisputed testimony that while electioneering was done by some men in the plant, it was done on behalf of all competing organizations, CIO and AF of L as well as the independent unions. Management freely permitted the activities of the affiliated organizations carried on within the plant on company time in electioneering prior to the election of May 1, 1942.

That a deep-seated desire existed among many of the employees at TAPCO to be represented by independent unions is shown not only by repeated testimony, but by the fact that in the second election held at TAPCO August 30, 1944, where employees were not permitted to vote for AWA, there were 1,276 votes cast for CIO and 4,582 for "No."

▇▇▇There is no substantial probative evidence growing out of the election that TAPCO coerced its employees to vote against CIO. The celebration of the defeat

298

in a party arranged for by AWA and A&AWA some two weeks later could not in any way influence the election. The fact that some representatives of management attended is immaterial. It was not illegal for them to express a preference, either before or after the election.

█ The respondents were clearly guilty of a violation of the statute in coercive statements made by supervisory employees to workers, set forth in detail in the trial examiner's report. All of these incidents occurred in Cleveland at TP, and not in Euclid at TAPCO. The president, Crawford, for instance stated to Loebs, a Board witness, that he did not understand why there should be dissatisfaction among the employees or why they should want the outside organization, and invited Loebs to visit him at his office. While this was not directly coercive, it could well be so construed by the employee. However, there is no substantial probative evidence that these statements had the slightest influence at TAPCO. In addition to being some eight miles distant from TP, it was under a divided control. The TAPCO plant and most of the machinery were the property of the United States Government, owned by the Defense Plant Corporation, and many representatives of the Army and Navy were in constant attendance, supervising operations at TAPCO.

█ In view of the conversations of supervisory employees at TP which were coercive, the Board was authorized to issue a cease and desist order; but it was not authorized to disestablish the AWA organization at TAPCO, which was freely formed and operated by the employees themselves.

█ The order of the Board setting aside the election held May 1, 1942, and ordering a subsequent election does not fall within our jurisdiction to review. Subsequent elections conducted under the order of the Board in 1944 at TP and TAPCO, and in 1945 at TP, had the following result:

August 30, 1944
At TP 1291 for the UAW-CIO
 256 for the IAM
 2033 for "Neither"

At TAPCO 1276 for the UAW-CIO
 4582 for "No"

October 23, 1945
At TP 929 for the UAW-CIO
 55 for the UAW-AFL
 1707 for "Neither"
At TAPCO (No election was held.)

█ There is no substantial evidence supporting the Board's finding that TAPCO and TP dominated and interfered with the formation and administration and contributed support to AWA. The portion of the order so finding will be set aside.

Discriminatory Discharges and Layoffs.

The Board found that Kenneth Wilson and Erwin Baur had been discriminatorily discharged for union activity or membership.

█ As to Kenneth Wilson, substantial evidence of discrimination exists, and that portion of the order relating to him will be enforced.

█ As to Erwin Baur, the finding cannot be sustained. Baur was hired as a gauge maker by TAPCO on December 18, 1941. He had worked at the Cleveland plant of the Fisher Body Company, which was a CIO plant, and was a CIO member. As found by the examiner and the Board, he was hired on the usual thirty-day probation basis. He was discharged on January 7, 1942, because, as stated by Superintendent McBride, he was not skilled on the job, he had not been able to "make out and make a reasonable number of pieces," and he used too much time in talking. While McBride discharged Baur, Lindner was his immediate supervisor, Grodt was his foreman, and McBride acted on their recommendations. None of these supervisors is accused of having made anti-union statements of any character, and the Baur incident is the only accusation against them with reference to the CIO. Since Fisher Body was a known CIO plant, Baur was hired with knowledge that he belonged to that union.

The Board adopted the findings of the trial examiner with certain modifications. It found that Baur "had become a known advocate of the U.A.W.-C.I.O. and a prominent opponent of the illegal A.W.A."

It also found that "There is no credible evidence that Baur talked excessively or that his production was unsatisfactory when weighed against that of other comparable employees." The trial-examiner based his conclusion as to Baur principally on the fact that Baur was discharged on the day after he had worn a CIO shirt, and this finding was approved by the Board. Baur had for some time been the subject of criticism from Grodt and Lindner, and his probation period was nearing the end. On the day following the one on which he wore the shirt, Baur was three hours late to work. He explained this by stating that his car had frozen up, but admitted that he did not call the shop to explain his absence. He was discharged upon his arrival at work.

We think the examiner and the Board disregarded the undisputed facts in finding that this was a discriminatory discharge. It was usual for members of the CIO to wear their shirts at the plant. It is not charged that any of the supervisors questioned the wearing of the shirt or any union activity in the toolroom. Contrary to the finding of the Board that Baur "had become a known advocate of the U.A.W.-C.I.O.," he was a known CIO member when he was hired, because he came from a CIO closed shop plant. He was not a steward nor official of the CIO. He never talked about the CIO, so he says, in the presence of supervisors or company officials. The Board, incidentally, brands the AWA as being an "illegal" association, in speaking of Baur's opposition to it. AWA was not found to be illegal until August 4, 1944, and Baur was discharged January 7, 1942.

Baur's own testimony refutes the finding that there was no credible evidence that he talked excessively. There was in fact no evidence to the contrary. By his own reiterated admissions Baur talked so much that he must have retarded his own production and the production of others near him. This is particularly true as he was doing precision work which required concentration. Baur testified that he talked upon the merits of the CIO "at all times," and said that his talks took place "quite frequently, maybe half a dozen, maybe a dozen, maybe twenty times" a day. He testified specifically that he talked a few minutes, "five or ten minutes, possibly," and that he talked as long as he could hold "their attention." There were only six or seven men working in the toolroom. Klopfenstein, who worked right next to Baur, testified "I had to tell him to go to work on various times; he talked more than the average fellow would; he bothered me, in fact." Ed Sarkisan, a learner who sat next to Baur, was hindered by Baur's excessive talking. Sarkisan's production had fallen off from the time that Baur was hired. Superintendent McBride concluded that Baur "used up quite a bit" of Sarkisan's time, and transferred Sarkisan to another shift, where his production immediately improved. Lindner complained to McBride and to Grodt about Baur's talking habits, and said "He would loaf around, talk to this fellow, go back to his bench, pick up his work, start all over again, stop again, and the work was not close enough."

[redacted] Lindner had frequently complained of the quality of Baur's work. Baur's statement that his work would stand up in comparison with that of other gauge makers of the department has little meaning when it is considered that the others were learners. The Board discounted Lindner's testimony because McBride did not lean heavily upon it; but McBride relied upon Grodt and Lindner's judgment, and they had questioned the quality of Baur's work repeatedly. The fact that Baur was hired in other plants during the war man-power shortage does not afford a sound basis for ignoring the undisputed testimony of supervisors that they were dissatisfied with Baur's work.

The Board emphasizes the fact that no records were produced to substantiate the fact that Baur had a poor work record. His discharge was not questioned until February, 1943, thirteen months after he left the plant. Baur himself admitted, as stated by the supervisors, that it was difficult to determine production on precision gauges. The Board also failed to take into account the important fact that Baur was hired on probation. The company was en-

titled to treat him as being on trial, and moreover, it is uncontradicted that personal memorandums and work records are not made as to probationary employees.

■ The power given the Board by the statute to decide the facts does not authorize the Board to ignore conceded, undisputed or established material facts. The finding the Baur was discriminatorily discharged is not supported by substantial evidence.

#### The Sticker Incident.

■ The Board was in error in ordering the respondents to reimburse five employees for the layoff involved in the so-called sticker incident. These employees were laid off because they had violated a company rule which had been published on the bulletin boards at TP, stating that it was a "violation of company rules to deface the factory walls in any manner, to post stickers or other information at any place except authorized bulletin boards, or to spread litter in the plant."

The Board found that the respondents were authorized to make such a rule, but found that it was discriminatory to enforce it at the same time that AWA was allowed to post election material. This organization, however, was at the time the exclusive representative of the employees, and had a valid contract allowing it to use bulletin boards throughout the plant. The Board found that the men who concededly violated the rule did not know of the order. This finding flies in the face of the fact that every application for employment charges employees with notice of all bulletins. Moreover, the TP Organizer, the CIO publication which was distributed in the plant, on January 6, 1942, carried the following item under "Shop News":

"Company Degrades Plant Walls. The Company posted a bulletin stating that it is cause for immediate dismissal to deface the building walls. The Company with its 'Let's Have the Truth' bulletins (and the company union sensations) not only defaces the walls but also degrades them as well, and incidentally disgusts the workers."

■ Loebs, one of the men laid off, a CIO committeeman, admitted that the committeemen furnished the "Shop News," and were responsible for publication of the bulletin; but he denied being aware of the company's order. In March, 1942, Loebs was reprimanded for posting CIO literature. He said the plant policemen tore the posters down, and they made it a little tougher for him; Loebs and his co-workers glued the literature to company property. As to Loeb, this constitutes substantial probative evidence that he knew of the shop rule. No discrimination was practiced in the layoff. Gibson, a member of CIO, was returned to work without layoff on signing a statement agreeing to abide by the rules of the company. The layoff of men who denied violating the order, as distinguished from one who immediately acknowledged his fault, was a reasonable disciplinary action, and not unlawful.

We bear in mind that it is the function of the Board and not of this court to find the facts. This case reveals many misleading inaccuracies in the facts found. The trial examiner's report occupies some 170 pages of the printed record, and in the main his findings were approved by the Board. Respondents filed 268 exceptions to the findings, which were supported by detailed citations to the record. A careful comparison of the exceptions with the testimony and exhibits cited and with the findings excepted to shows that the findings in effect requested by respondents in their exceptions were in many cases supported by undisputed evidence and by much testimony given by Board witnesses favorable to the CIO. Exceptions 7, 9, 10 and 11 attack the findings of the examiner correctly, upon the ground that they conflict either wholly or in part with the findings of the Board in the former TP case, 33 N.L.R.B. 1037-1055. A number of the errors pointed out were material in the construction of the whole picture, and should have been corrected.

We follow the findings of the Board upon matters in which they are supported by substantial testimony, but upon matters upon which it made no findings, we have

followed the undisputed testimony. We think this is the purport of the provision in the Administrative Procedure Act, 5 U.S. C. § 1009(e), 5 U.S.C.A. § 1009(e), in effect at the time of the hearing in this court, that the reviewing court in making its determinations shall "review the whole record or such portions thereof as may be cited by any party, and due account shall be taken of the rule of prejudicial error." On the whole record, we find that it was prejudicial in this case not to find undisputed material facts.

The order of the Board as to the nullification of the elections of May 1 and 2, 1942, and the holding of new elections, has been fully performed. This court has no power to review the order, and it would obviously be futile to issue a decree enforcing it. That part of the order therefore will be stricken out.

The order of the Board is modified in the following respects:

(1) By striking from paragraph 1(a) in lines 2 and 3 thereof, the words "Aircraft Workers Alliance, Inc., or";

(2) By striking from paragraph 1(b) in line 1 thereof the words "Aircraft Workers Alliance, Inc., or";

(3) By striking from paragraph 1(c) in line 2 thereof the words "Aircraft Workers Alliance, Inc., or";

(4) By striking from paragraph 2(a), in line 2 thereof, the words "Aircraft Workers Alliance, Inc., and";

(5) By striking from paragraph 2, subparagraph (c) in its entirety, and substituting therefor the following:

(c) Make whole George Whitbread and Kenneth Wilson for any loss of pay they have suffered by reason of the respondent's discrimination against them, by payment to each of them of a sum of money equal to the amount which he normally would have earned as wages from the date of his discharge or layoff to the date of his reinstatement or the respondent's offer thereof;

(6) By inserting in paragraph 2(d), in line 11 thereof, after the words "to become and remain members of," the words "Aircraft Workers Alliance, Inc., or";

(7) By striking from the order the last three paragraphs thereof which deal with the vacation of the elections held on May 1 and 2, 1942, and order a second direction of elections.

A decree will issue enforcing the order as above modified.